396 F.2d 44
 1 Empl. Prac. Dec. P 9879
 UNITED STATES of America and Doris Elaine Brown, et al., Appellants,
v.
The BOARD OF EDUCATION OF the CITY OF BESSEMER et al., Appellees.
UNITED STATES of America and Dwight Armstrong, et al., Appellants,
v.
BOARD OF EDUCATION OF the CITY OF BIRMINGHAM, JEFFERSON
COUNTY, ALABAMA, et al., Appellees.
UNITED STATES of America and Linda Stout, by her father and
Next Friend, Blevin Stout, Appellants,
v.
JEFFERSON COUNTY BOARD OF EDUCATION et al., Appellees.
 Nos. 25809-25811.
 United States Court of Appeals Fifth Circuit.
 June 3, 1968.
 
 Stephen J. Pollak, Asst. Atty. Gen., Macon L. Weaver, U.S. Atty., Frank M. Dunbaugh, Kenneth L. Johnson, Walter Gorman, Attys., Department of Justice, Washington, D.C., for the U.S.
 No. 25809: David H. Hood, Jr., Bessemer, Oscar W. Adams, Jr., Harvey M. Burg, Birmingham, Norman C. Amaker, Charles H. Jones, Jr., New York City, Macon L. Weaver, U.S. Atty., Birmingham, Nathan Lewin, Atty., Dept. of Justice, Washington, D.C., for appellants.
 Gorden Madison, Asst. Atty. Gen., Montgomery Reid B. Barnes, Birmingham, J. Howard McEniry, Jr., Bessemer, for appellees.
 
 
 1
 No. 25810: Macon L. Weaver, U.S. Atty., Birmingham, Ala., Charles H. Jones, Jr., New York City, Kenneth L. Johnson, Nathan Lewin, Attys., Dept. of Justice, Washington, D.C., for appellants.
 
 
 2
 Reid B. Barnes, Birmingham, Ala., for appellees.
 
 
 3
 No. 25811; Macon L. Weaver, U.S. Atty., Birmingham, Ala., Nathan Lewin, Atty., Dept. of Justice, Washington, D.C., Norman C. Amaker, Charles H. Jones, Jr., New York City, Harvey M. Burg, Oscar W. Adams, Jr., Birmingham, Ala., for appellants.
 
 
 4
 Maurice F. Bishop, Reid B. Barnes, Birmingham, Ala., for appellees.
 
 
 5
 Before BROWN, Chief Judge, DYER, Circuit Judge and GARZA, District judge.
 
 JOHN R. BROWN, Chief Judge:
 
 6
 The issue here is to determine what the School Boards[1] are required to do in desegregating their respective faculties.[2]
 
 
 7
 In the spring of 1967 the Court below entered decrees against the School Boards in exact conformity with out model decree as set forth just shortly before in Jefferson,[3] including the provisions for faculty integration.[4]
 
 
 8
 On the eve or just after the start of the 1967-68 school year, the United States as intervenor, dissatisfied with the progress (or lack of it) in faculty desegregation, filed motions for further relief and submitted a proposed decree in each case.[5] After factual hearings the District Court denied relief and this Court expedited the appeals. We reverse and remand.
 
 
 9
 As figures speak and when they do courts listen, United States v. Jackson Oldsmobile, Inc., 5 Cir., 1967, 371 F.2d 808, 809 (concurring opinion); Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, 9 and cases cited n. 14, the stage setting of undisputed facts reveals that substantial segregation still exists in the faculties of these schools. The total number of teachers in the three systems is 5297, but of these only 47, or .89% Teach in desegregated situations. of 3230 white teachers, only 9 or .28% Teach with faculties which are predominantly Negro, and only 38 of 2067 Negro teachers, or 1.84% Teach in faculties that are predominantly white.[6]
 
 
 10
 In terms of sheer numbers only a very, very little bit has been done. Whether this tiny numerical change really amounts to a great deal more or, in any event, considering shortness of time in the light of operational problems geared to a school year and the timing and content of the Jefferson decree (note 3 supra), whether this actual performance called for corrective relief by the trial court (or by us now) are the questions presented for determination.
 
 
 11
 In underlying detail there is little variance from one system to the other. The percentage of desegregating teachers runs from a low-low of .40% In Jefferson to a not-very-high of 1.37% In Birmingham (note 6 supra). By school-- meaning a separate physical plant-- only 21 of 222 schools, or less than 10%, have any faculty desegregation whatsoever.[7]
 
 
 12
 Why there has been no further progress is not hard to find. Indeed, it is not even concealed, nor was there any effort to gloss over it. The School Boards purposefully, not inadvertently, candidly took an identical approach: Only those teachers who volunteered to move to a school with a faculty where the majority of teachers were of a race different than their own were transferred. Very few volunteered, and no compulsion-- or for that matter, persuasion-- of any sort was exerted by the School Boards.[8] This policy was given a retrospective judicial imprimatur by the Judge's denial of relief. With characteristic articulation he made it positive and clear.[9] This, we conclude, was a major error-- an error of law-- which directly led the Judge to an erroneous approach concerning the nature and purpose of the motions and the real question then before the Court. His was a four-step analysis. First, he took note of Jefferson's goal of Circuit-wide uniformity[10] and the right to seek modifications of the decree.[11]
 
 
 13
 Second, he found that 'indisputably, (it was) established that for the 1967-68 school year defendants had not fully complied with the provisions of paragraph VIII of the decree, the heart of which is embodied in the one sentence: 'Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race." Third, the Judge concluded that the 'facts developed * * * were not intended to, and did not, disclose the existence of exceptional circumstances requiring modification of the decree.' Fourth, and as the climax, casting it in terms of a contempt proceeding, he concluded that the 'court is convinced that defendants have not contumaciously violated the terms of its decree. Efforts to comply therewith have been made in good faith and substantial transitional steps have been taken.'
 
 
 14
 As this whole opinion reveals we agree with the Judge's finding (see step second, above) and equally with the parting shot of his opinion denying relief that 'obedience to, not modification of, the clear and direct terms of the decree is required.'
 
 
 15
 We think putting it in the mold analogous to a contempt proceeding is a mistake of more than formal, procedural consequences. It just puts emphasis on the wrong things, burdens on the wrong parties. At this very, very late date in the glacial movement toward school racial integration it should no longer be an issue of good faith. The question is and must always remain: Is the constitutional imperative being met? That duty is not on plaintiffs, nor on the government, nor on school children. It is squarely on the back of the State and here, the State's Agents, the School Boards. Next, by the nature of things, the Court itself has something more than the passive role of private litigation. It has the right-- indeed it has the duty-- in the face of facts showing little, if any, compliance to cry out in a juridically scriptural way to those on whom its orders pin the burden: 'When, oh when? What is being done? What, exactly what are you going to do? Not what are your hopes?'[12]
 
 
 16
 These sort of factors bear on us as well. Thus it is pointless now to characterize accomplishments to date by colorful adjectives or to weigh retrospectively what ought to have been done but which, alas, has not been done and for that matter can now never be done. This would put into the balance competing forces. On the one side is, of course, the chronological factor that Jefferson itself, and more directly the Jefferson-- compelled decrees in these cases[13] came out close to the end of the school year and at a time by which much of the faculty selection-- replacement operation was well under way. Time was, therefore, short. And much had to be done. Mostly because nothing had been done. Here comes into play the offsetting factor that Jefferson, while detailed and peremptory in its terms on those to whom it would directly apply, really did not herald anything new so far as the necessity of faculty integration was concerned. The handwriting was on the wall for all who ran to see, first in Price v. Denison Indep. School Dist. Board of Education, 5 Cir., 1965, 348 F.2d 1010, and almost simultaneously in Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1965, 348 F.2d 729. Eliminating all doubt was Bradley v. School Board of City of Richmond, Va. (Richmond), 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; and Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265. And the moving finger having writ was soon writing everywhere.[14]
 
 
 17
 So the day was not merely near at hand. The day was here. Indeed, it had been here since yesterday, yea, the day before that. The initial panel decision in Jefferson, On December 29, 1966, and the slight modification en banc (March 29, 1967) merely publicized what those who looked could see.[15]
 
 
 18
 Unfortunately, the clock has run. It still ticks. The past with its demonstrated performance (or lack of it) cannot be eradicated. The question then is: What is now to be done-- done (a) to achieve as soon as possible those things which ought to have been accomplished up to this time and (b) to finish the job?
 
 
 19
 We are requested to do both too much and too little. The school boards with a sincerity of counsel we do not question, urge us, in effect, to do nothing specific either in terms of target dates or racial percentage ratios, or both. The government, on the other hand, proposes that we direct the entry of a proposed sweeping, detailed decree which it frankly acknowledges adds to and extends Jefferson. We think neither alternative is wise.
 
 
 20
 First, we think it unwise and out of keeping with the declared goal (see note 10 supra) and subsequent consistent practice of Circuit-wide uniformity to tinker with the model decree. The Constitution guarantees equality. We must steel ourselves against the importunities to import inequality by judicial modifications to meet some supposed need of a locality. One immediate consequence of such a practice would be to encourage others to try their hand. And soon we'd be back in the school business again-- a role for which we are not equipped or competent to handle. The efforts to reduce the demands of Jefferson we've resisted so far. See, e.g., Barnhardt v. Meridian Municipal Separate School Dist., 5 Cir., 1968, 394 F.2d 454 (April 24, 1968); Gaines v. Dougherty County Board of Education, 5 Cir., 1968, 392 F.2d 669 (March 14, 1968); Stell v. Board of Public Education for the City of Savannah, etc., 5 Cir., 1967, 387 F.2d 486 (December 4, 1967). Even though Jefferson was more equivocal on faculty integration and expressed the likelihood of some lessons to be learned from experimentation,[16] we think we should apply an even hand to deny requests to enhance Jefferson's demands.
 
 
 21
 But this is far from leaving it to the well-intentioned expressions of hope by the School Boards. On the contrary, we think it important to do three positive things.[17] The first is to rule out the voluntary approach. The second is to fix an immediate target date. The third is to fix the date-- implicit in Jefferson-- for full compliance.
 
 
 22
 The School Boards, as did the District Judge, confuse two things. One is the duty of the School Boards. The other is what the personal action of a teacher will be on receipt of a transfer order to a school of the other race. Obviously, the fulfillment of the Constitution cannot rest on the willingness of people to abide. The School Boards do not meet their duty by soliciting volunteers. For the fact remains that the 'responsibility for faculty desegregation, just as the responsibility of student desegregation, lies ultimately with the board, not the teachers.' Davis v. Board of School Commissioners of Mobile County, 5 Cir., 1968, 393 F.2d 690, at p. 695 (March 12, 1968). So there will be no mistake about it we spell out that Jefferson stands for the proposition that there is an affirmative duty on the part of the School Boards to do everything-- the word is everything-- within their power to meet the decree-imposed complete desegregation of faculties. It is not, it cannot be, left to the voluntariness of teacher applicants or transfers. As this poses genuine problems in teacher availability especially in the light of the timing and practices of teacher employment so that the goal cannot be attained over night, the trial court likewise has a duty to require specific interim target dates and accomplishments which in the short course remaining will assure full compliance by 'C' day (Compliance Day). If the boards will not supply meaningful targets, the Judge must. And all this must be done under the most stringent time schedules to assure effectual performance or at least some semblance of meaningful appellate review if the interim targets are seriously thought to be unrealistic.
 
 
 23
 Of course this duty to order transfers or assignments is more than a paper obligation. Granted that no one has yet suggested that with the Thirteenth Amendment a teacher may be legal writ be forced into a classroom, the school board is not equally free. It has to make its assignment orders effective which could mean, of course, the sanction of discharge, of such an unwilling teacher, no matter how conscientious were the personal feelings against transfer. We do not, of course, undertake to say what, if any, rights such a teacher would have. But we are emphatic that the school board could not use local tenure or teacher hiring-security statutes[18] as a justification for failing to initiate and maintain desegregation of faculties. Any such result would empower a State, opposing the principles of a valid Federal Court decree, to override it through collateral legislation.
 
 
 24
 We do not minimize the problems at hand. Our action does not by any means take the essential educational expertise and discretion out of school administrators. No one has a higher estimate of the role or importance of teachers. But teachers should be, and mostly are, our finest public citizens. What they teach they must believe in. They do believe in the Constitution. And any ingrained opposition to change will pass from them too when it becomes evident from official school policy plus action that all are committed to eradication of race as a distinction in school facilities, student bodies, activities and faculties.[19]
 
 
 25
 Although time is exceedingly short, time available is even shorter.[20] Consequently we fix June 21, 1968 as the date by which each of the School Boards is to file with the District Court a report, verified by the Board, showing specifically and separately stated as to schools, classes, and races what it has done up to date in faculty integration, what it is currently doing and what its specific targets are for the school year 1968-69. The trial court shall superintend, as necessary, full exchange of factual information bearing thereon and shall then hold such hearings and arrive at a determination by July 30, 1968 approving such proposed schedule and specifying in detail the steps to be taken by the School Boards as to any modifications or disapprovals thereof. This shall be stated in terms that clearly define the Board's responsibilities.
 
 
 26
 This leaves the problem of the ultimate 'C day.' We think it entirely consistent with Jefferson to say that full compliance should be reached by the opening of the school year 1970-71. But since that is just two school years away and neither the Court nor the Negro plaintiffs should have to run the risk of an announced failure on the eve of school opening in 1970-71 it is perfectly evident that the District Judge in the forthcoming June-August proceedings must exact or impose specific targets. That will be repeated, only more so, as time marches on into 1969, then into 1969-1970.
 
 
 27
 Finally, we think it appropriate to sound these comments. We do not seek the burden or responsibility of school operation. We ought not to have it. By now the law is clear. These cases bear many service stripes including many trips to this Court. The aim of Jefferson is to lay down sufficiently definitive standards so all can understand and apply them. Now it should be up to school boards either alone in taking the initiative so obviously called for, or in conjunction with cooperative (it is hoped) efforts of parent, race or similar groups to achieve the goal of race-less public schools. To be sure, this puts burdens on all sides but this too, is part of constitutional democracy. The Judiciary is not, cannot be, the universal salvor. In saying this we believe we express for the District Judge-- indeed all of them-- a like hope that the schools soon run without orders of any kind from Courts, Federal or State.
 
 Reversed.[21]
 
 
 [1]
 This term embraces all of the three Appellees, the Board of Education of the City of Bessember, the Board of Education of the City of Birmingham, and the Jefferson County Board of Education. Geographically these are in the Birmingham metropolitan area
 
 
 [2]
 Related, but subsidiary, issues concern discrimination in hiring substitute teachers and in placing student teachers in the various schools
 
 
 [3]
 United States v. Jefferson County Bd. of Educ., 5 Cir., 1966, 372 F.2d 836, aff'd on rehearing en banc, 5 Cir., 380 F.2d 385, cert. denied, sub nom. Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103
 
 
 [4]
 '(a) Faculty Employment. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties and to achieve substantial desegregation of faculties in as many of the schools as possible for the 1967-68 school year notwithstanding that teacher contracts for the 1967-68 or 1968-69 school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school
 '(b) Dismissals. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifications of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the Clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.
 '(c) Past Assignments. The defendants shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.'
 
 
 [5]
 The motions were filed between August 29 and September 22, 1967
 
 
 [6]
 The number of desegregating teachers in each system is as follows:
 Desegregating Teachers
 ----------------------
 Percentage
 Teaching of Desegregating
System Positions White Negro Teachers
------------- --------- ----- ----- ----------------
Bessemer 381 2 2 1.05%
Birmingham 2416 2 31 1.37%
Jefferson Co. 2500 5 5 .40%
 --------- ----- ----- ----------------
 5297 9 38 .89%
7 The figures are vivid:
 Percentage of Schools with Segregated Faculties
 -----------------------------------------------
 Percentage
 of Schools
 No. of Segregated Integrated That Are
System Schools Faculties Faculties Segregated
------------- ------- ---------- ---------- ----------
Bessemer 12 10 2 83.3%
Birmingham 102 89 13 87.3%
Jefferson Co. 108 102 6 94.4%
 ------- ---------- ---------- ----------
 222 201 21 90.5%
 Of the twenty-one schools having teachers of both races, eight have only one minority race teacher and eleven have only two.
 Considering the structuring of schools to class rooms and classes a statistic based on buildings (approximately 10%) means little. Additionally, this does not even meet the moderate Jefferson requirement that 'wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty.' 380 F.2d at 394. (note 3 supra.)
 
 
 [8]
 The methods used by each school board were substantially identical in many respects. Bessemer sent a questionnaire to each of its faculty members asking if any would be willing to volunteer for a teaching assignment in a school where the staff was predominantly of another race. If the answer to that question was 'no,' then each teacher was asked if he would accept such an assignment if requested to do so. Out of 381 teachers, 4 white teachers said they would go if requested, 10 Negro teachers volunteered to go, and 188 Negro teachers said they would go if requested. In Jefferson County the approach was also one of voluntary compliance only. But instead of a questionnaire, the Assistant Superintendent asked each school Principal and supervisor to furnish the names of teachers qualified both educationally and emotionally to teach in a school where they would be in a racial minority. The names of 30 white teachers and 80 Negro teachers were submitted and of this number 3 white teachers were transferred and 4 Negro teachers were transferred. In Birmingham, the approach was similar to that of Jefferson County. A total of 224 names was submitted (107 Negro teachers and 117 white teachers were considered) and of that number there was a transfer of 31 Negro teachers and 2 white teachers
 
 
 [9]
 During the oral hearing the Judge stated:
 'I shall never require compulsory reassignment. I will say that. I think probably that as long as the composition of the faculty is structured on a volunteer basis, that that would not meet the test but to say that the expressed wishes of a teacher can be callously denied, I don't agree that could be so. I think you must inquire as to the willingness of teachers to be reassigned and I would never hold there was a failure to comply with the decree if there wasn't that willingness present.'
 
 
 [10]
 'The provisions of the decree are intended, so far as possible, to apply uniformly throughout this circuit in cases involving plans based on free choice of schools.' 372 F.2d 894
 
 
 [11]
 Immediately following the statement (note 10 supra) the following appears:
 'School boards, private plaintiffs and the United States may, of course, come into court to prove that exceptional circumstances compel modification of the decree.'
 
 
 [12]
 Three years ago we repeated in Price v. Denison Independent School District Board of Education, 5 Cir., 1965, 348 F.2d 1010, 1012, the more austere phrasing of this principle we had sounded five years ago in Ross v. Dyer, 5 Cir., 1963, 312 F.2d 191, 194:
 '* * * It is now clear that even though the 1960 order prescribes a plan in specific detail, this is not the end of the matter. The District Court of necessity retains continuing jurisdiction over the cause. That means that it must make such adaptations from time to time as the existing developing situation reasonably requires to give final and effectual voice to the constitutional rights of Negro children.'
 More recently in Davis v. Board of School Commissioners of Mobile County. 5 Cir., 1968, 393 F.2d 690, (March 12, 1968) we echoed with approval like sentiments from Clark v. Board of Education of Little Rock School District, 8 Cir., 1966, 369 F.2d 661, 670:
 'The lack of a definite program will only result in further delay of long overdue action. We are not content at this late date to approve a desegregation plan that contains only a statement of good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan.'
 
 
 [13]
 The Jefferson en banc issued March 29, 1967. The model decrees were entered in these cases on April 17, 1967 (Jefferson County and Bessemer) and May 8 for Birmingham
 
 
 [14]
 See, e.g., Clark v. Board of Education of Little Rock School Dist., 8 Cir., 1966, 369 F.2d 661; Smith v. Board of Education of Morrilton School Dist. No. 32, 8 Cir., 1966, 365 F.2d 770; Wheeler v. Durham City Board of Education, 4 Cir., 1966, 363 F.2d 738
 
 
 [15]
 The Court spoke in terms of existing law. See, for example, the 'decisions compel states in this circuit to take affirmative action to reorganize their school systems by integrating the students, faculties, facilities and activities.' United States v. Jefferson County Board of Education, supra, 372 F.2d at 862. At several other places we reiterated the duty on the part of school boards to integrate their faculties. At 372 F.2d 863, quoting Singleton v. Jackson Municipal Separate School Dist., 5 Cir., 1966, 355 F.2d 815 (Singleton II), we stated that the Constitution forbids unconstitutional state action in the form of segregated facilities and that school authorities are under a compulsion to furnish a single integrated school system. At p. 868 of 372 F.2d in Jefferson County we said that 'faculties, facilities, and activities as well as student bodies must be integrated.' We further pointed out at p. 883 that 'one of the keys to desegregation is integration of faculty.'
 
 
 [16]
 See United States v. Jefferson County Bd. of Educ., supra, 372 F.2d at 894
 
 
 [17]
 We merely extend the approach recently taken by this Court in Jones v. Caddo Parish School Board, 5 Cir., 1968, 392 F.2d 721, (March 27, 1968). There, on motion to summarily reverse an unbriefed, unargued case, this Court suggested that 'the appellants dismiss these appeals and concentrate their efforts in working out the method of obtaining substantial compliance administratively with the appellee boards' and under which the trial court could fix specific target dates and accomplishments for the coming school year in time to permit effective relief if unsatisfactory to the parties
 
 
 [18]
 The briefs cite us to Title 52, Code of Alabama 355, 356, 359 on transfers, hearings, contract termination, etc
 
 
 [19]
 Population explosions, the undulating movement of a people on the move may be one of the ameliorative factors. For there is a high turn-over in teacher rolls as this table portrays in the number, by race, of vacancies and the number, by race, of such vacancies filled in 1967-68:
 White Schools Negro Schools
 ------------- -------------
 Filled Filled
 ---------- ---------
System Vacancies by Negroes Vacancies by Whites
------------- --------- ---------- --------- ---------
Bessemer 23 2 15 2
Birmingham 257 31 112 2
Jefferson Co. 468 5 96 5
 --------- ---------- --------- ---------
 748 38 223 9
 The Bessemer experience showed that 192 of the 388 teacher force in the system would transfer if requested to do so. (See note 8 supra).
 
 
 [20]
 Actually, it's more than appears for on the expedited arguments May 1, 1968, we announced from the bench the likelihood that the Court would set up a June-August time-table after the manner of Jones v. Caddo Parish School Bd., note 17 supra
 
 
 [21]
 The subsidiary problems of student teachers and substitute teachers are but tag ends to the main problem of assuring integration of the permanent faculty. The Appellees should set forth in their integration plan the steps they intend to take to assure that student and substitute teachers are not placed in a discriminatory manner
 Because of shortness of time the mandate will issue immediately with no stays available during the rehearing or review process.