406 F.2d 1331
 Eric CLEVELAND et al., Appellants,
v.
UNION PARISH SCHOOL BOARD et al., Appellees.
Alfreda TRAHAN et al., Appellants,
v.
LAFAYETTE PARISH SCHOOL BOARD et al., Appellees.
Virgie Lee VALLEY et al., Appellants, United States of
America, Appellant-Intervenor,
v.
RAPIDES PARISH SCHOOL BOARD et al., Appellees.
 Nos. 27087, 27054, 27106.
 United States Court of Appeals Fifth Circuit.
 Jan. 9, 1969, On Motion for Rehearing En Banc Feb. 17, 1969.
 
 Nils R. Douglas, Richard B. Sobol, George M. Strickler, Jr., robert P. Roberts, New Orleans, La., John F. Ward, Baton Rouge, La., Collins, Douglas & Elie, New Orleans, La., for appellants.
 W. C. Falkenheiner, Dist. Atty., Vidalia, La., James T. Spencer, Farmerville, La., Albin P. Lassiter, Monroe, La., Fred L. Jackson, Homer, La., Kermit M. Simmons, Winnfield, La., for appellees. No. 27054:
 Jack Greenberg, Franklin E. White, Willaim Bennett Turner, Norman C. Amaker, New York City, A. P. Tureaud, New Orleans, La., Louis Berry, Alexandria, La., Murphy W. Bell, Baton Rouge, La., Marion Overton White, Opelousas, La., for appellants.
 Gus Voltz, Jr., Asst. Dist. Atty., Edwin O. Ware, Dist. Atty., Alexandria, La., Bernard N. Mercantel, Jennings, La., Henry L. Yelverton, Lake Charles, La., J. Bennett Johnston, Jr., John A. Richardson, Shreveport, La., J. Y. Fontenot, Dist. Atty., Opelousas, La., Nolan J. Edwards, Asst. Dist. Atty., Crowley, La., Harry J. Kron, Jr., Thibodaux, La., Bernard E. Boudreaux, Jr., Franklin, La., Knowles M. Tucker, New Iberia, La., L. O. Fusilier, J. William Pucheu, Ville Platte, La., Ronald C. Martin, Dist. Atty., Natchitoches, La., for appellees. No. 27106:
 
 
 1
 A. P. Tureaud, New Orleans, La., Stephen J. Pollak, Asst. Atty. Gen., Merle W. Loper, Nathan Lewin, Jesse H. Queen, Robert T. Moore, Frank M. Dunbaugh, Attys. Dept. of Justice, Washington, D.C., Edward L. Shaheen, U.S. Atty., Shreveport, La., William Bennett Turner, Jack Greenberg, Norman C. Amaker, Franklin E. White, New York City, Jerris Leonard, Asst. Atty. Gen., Edward S. Christenbury, Atty., Department of Justice, Washington, D.C., for appellants.
 
 
 2
 Fred L. Jackson, Homer, La., Edwin O. Ware, Dist. Atty., Gus Voltz, Jr., Asst. Dist. Atty., Alexandria, La. E. Rudolph McIntyre, Winnsboro, La., John A. Richardson, Shreveport, La., for appellees.
 
 ORDER
 
 3
 The Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the motion for Hearing En Banc is denied.
 
 
 4
 (s) John R. Brown CHIEF JUDGE
 
 
 5
 Before JOHN R. BROWN, Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, CLAYTON* and MORGAN, Circuit Judges.
 
 ON MOTION FOR HEARING EN BANC
 
 6
 WISDOM, Circuit Judge, with whom BROWN, Chief Judge, and GOLDBERG, Circuit Judge, join.
 
 
 7
 I respectfully dissent from the denial of the hearing en banc.
 
 
 8
 Fifteen years after Brown,[1] school boards in the Western District of Louisiana are still unwilling to face up to the prerequisites to effective desegregation. These prerequisites are the transitionary short steps which must be taken now and the planning for the long steps that must be taken in 1969-70/1970-71 to effect lock-stock-and-barrel desegregation. More than two years after Jefferson,[2] this Court is still not able to get the message through to these school boards that the standard for determining the effectiveness of a desegregation plan is an objective one: Does it work?[3] Fidelity to our earlier holding in these very cases now consolidated in three appeals,[4] fidelity to other decisions of this Court[5] and of the Sureme Court,[6] indeed fidelity to federal judicial process command summary reversal.[7]
 
 
 9
 These thirty cases, consolidated in three appeals, were among forty-four cases consolidated on appeal in Adams v. Mathews, No. 26501. In Adams, on August 20, 1968, we set deadlines for action by the school boards and by the district court. We did so to prevent the delay here granted by the district court and now blessed by a majority of this Court. Our object was to forestall the ubiquitous contention that it is too late this school term to make extensive changes in the next school term.
 
 
 10
 The order in Adams is short. It is quoted, in pertinent part, in the footnotes.[8] We required the district court to 'treat school desegregation cases as entitled to the highest priority and conduct a hearing in each case at the earliest practicable time, no later than November 4, 1968'.[9] If, in a particular case, the district court concluded that the existing freedom of choice plan was not working but that it was not administratively feasible for the board to shift 'immediately' to other alternatives the court was directed to require the board
 
 
 11
 (1) 'to take forthwith such steps toward full desegregation as may be practicable in the first and second semesters of the 1968-69 school year, and (2) to formulate and submit to the Court by November 28, 1968, a plan to complete the full conversion of the school district to a unitary, non-racial school system for the 1969-70 school year'.
 
 
 12
 We directed the district court to 'enter an order by such date as will permit effective review, if review is necessary, of the court-approved actions the Board will institute in the 1968-69 year as well as the 1969-70 year'. Unfortunately for the constitutional rights of Negro students, the 1968-69 term will be over by the time this case is heard and decided on 'expedited' appeal. Full desegregation in the 1969-70 term is made difficult, if not impossible, by the unwillingness of the school boards to take effective transitionary action.
 
 
 13
 On remand, the district court found that the 'school boards are acting in good faith'. But good faith does not excuse non-compliance; it is relevant only as a necessary ingredient of an acceptable desegregation plan.
 
 
 14
 The district court's major finding was that the decree under which the boards have been operating since the fall of 1967 has 'real prospects for dismantling the dual system 'at the earliest practicable date"-- whenever that is. Apparrently because of this finding, the district court did not require the school boards to 'take forthwith' any steps for the 1968-69 school year. And instead of requiring the boards to submit by November 28, 1968, specific plans for full conversion to a unitary, non-racial system, the district court required each board to 're-assess its own system and on or before March 1, 1969, make a report * * * as to what additional courses are open to it to bring about the end result required by the Supreme Court in Green.'
 
 
 15
 I turn now to the Supreme Court's conclusions as to what does not constitute 'real prospects for dismantling the dual system'. In Green, the Supreme Court found the following criteria relevant to workability of a school desegregation plan (1) A school board's adoption of a freedom of choice plan 11 years after Brown I was decided and 10 years after Brown II raises the inference that the board deliberately perpetuated the unconstitutional dual system. 'Such delays are no longer tolerable * * *. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now'; not at 'the earliest practicable date'.[10] (2) Freedom of choice is not acceptable if its effect is to shift the burden of desegregating schools from the school board to the children and their parents.[11] (3) Existence of an all-Negro school[12] and (4) the fact that 85 percent of the Negro children attend all-Negro schools demonstrate, as a matter of law, that a desegregation plan is not working.[13] (5) Green does not deal with faculty desegregation. The Supreme Court has held, however, that students in public schools have a constitutional right to attend schools where teachers have not been assigned on the basis of race.[14] As to faculty, Jefferson held that nothing less is required than 'that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school'.[15] Bessemer set a date for 'C-day', the first day of the 1970-71 term, for full compliance with the requirement of faculty integration.[16] The Fourth and Tenth Circuits require, as a remedy to eliminate faculty segregation, 'the same approximate percentage of non-white teachers in each school as there now is in the system'.[17]
 
 
 16
 This Court has held that 'school authorities bear the burden of justifying an apparent lack of progress'.[18] At the November 12 hearing the school boards came forward with no suggested steps that might ease the transition from a dual to a unitary system. They relied on the socalled Jefferson reports to the courts, statistical records showing the degree of desegregation. These reports show that there is no basis for the district court's findings. On the contrary, there is not one case where a desegregation plan meets the Green-Jefferson criteria and none that offers any hope of 'working' without substantial additions and changes.
 
 
 17
 There are seven school districts involved in the cases consolidated in No. 27,087.[19] Here are the facts as to those districts. (a) The 37 traditionally Negro schools remain all-Negro schools. (b) The number and percentage of Negroes attending formerly all-white schools is as follows:
 
 
 18
 )ng
 
 
 19
 (c) The figures on faculty integration are unclear, e.g. they do not reflect the courses taught by teachers or whether an arts teacher for several schools is treated as a member of the faculties in the several schools. The number of Negro teachers on the faculties in white schools and the number of white teachers on the faculties of Negro schools is as follows:
 
 
 20
 )s o
 
 
 21
 There are 13 school districts involved in the cases consolidated in No. 27106. There are 103 virtually all-Negro schools enrolling 97 percent of the Negro students; that is, three percent attend white schools. In 12 of the 13 school districts 5 percent, or less, of the Negro students attend white schools; in Avoyelles Parish 12 percent of the Negro students attend white schools. No white students attend or have attended Negro schools in 11 of these district; one white student attends a Negro school in Bossier Parish, and one in Caddo Parish. The faculty desegregation is as follows:
 
 
 22
 )cho
 
 
 23
 There are fifteen school districts involved in the cases consolidated in No. 27,054. In a few districts there has been progress in student desegregation. In Vermilion Parish, for example, 44 percent of all Negro students attend former white schools.[20] But it can hardly be said that free choice is working in Evangeline Parish. In that parish the percentage of Negro students attending white schools dropped from 2.9 percent in 1967-68 to 2.3 percent in 1968-69. The following tables show the extent of student and faculty desegregation as of September-October of 1968:
 
 
 24
 )e e
 
 
 25
 I am not suggesting that freedom of choice should necessarily be abandoned in favor of zoning. In some areas, because of residential patterns based on race, court-approved school zoning would legalize the Southern equivalent of Northern de facto segregation. In many school districts freedom of choice has not worked because school boards have thought that they complied with the law simply by opening the doors of white schools to Negro children bold enough to apply for entrance. That is not the law. This Court and the Supreme Court have held that the dual system must be done away with, root and branch. There is nothing necessarily unconstitutional about freedom of choice or geographic zoning or a combination of the two. Whatever plan is used, transfers should be favored when a transferee is from a school where the transferee's race constitute a majority and he is transferring to a school where students of his race are in the minority; minority to majority transfers should not be favored. Principals are enormously important, especially in rural areas. They should be rotated or assigned to schools where students of the opposite race are in the majority. All athletic activities should have been desegregated years ago.
 
 
 26
 The statistical evidence points plainly to the fact that in a freedom of choice system white students will not attend a school having a Negro principal and all-Negro faculty. One remedy is for the school authorities to assign teachers on the basis of race, so that the faculty of each school will substantially reflect the racial composition of the total number of teachers in the system. The rule should not be inflexible. The proportion of teachers and staff in a school should substantially reflect the ratio of Negro teachers in a school to all teachers in the system such as would have resulted if, in the past, teachers had been assigned without regard to race. As this Court has held in other cases, race may be considered when it is necessary in fashioning a remedy to undo past unconstitutional discrimination.[21] The purpose is not to achieve racial balance as an end in itself but to use it as a means of ending the dual system based on segregated faculties in segregated schools. As the Seventh Circuit recently pointed out in a decision upholding a district court's order requiring bussing of children from one Chicago school to another, 'This is not done to achieve racial balance, although that may be the result, but to counteract the legacy left by the Board's history of discrimination.' United States v. School District 151 of Cook County, Illinois, Dec. 17, 1968, 404 F.2d 1125.
 
 
 27
 Freedom of choice as now administered by the defendant school boards fails all of the tests established by Green and restated in Adams in these very cases now before us.[22] The judgments below should be summarily reversed with instructions that each defendant school board be ordered to submit immediately a desegregation plan that 'promises realistically to work now', to the end that the school system be converted to one without white schools and Negro schools, but just schools.
 
 
 
 *
 Judge CLAYTON did not participate in the vote on a hearing en banc due to illness
 
 
 [1]
 Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180, (Brown I); 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (Brown II)
 
 
 [2]
 United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836 (Jefferson I), adopted on rehearing en banc, 1967, 380 F.2d 385 (Jefferson II), cert. denied, Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103
 
 
 [3]
 In Jefferson I this Court said, with emphasis, that 'The only school desegregation plan that meets constitutional standards is one that works.' 372 F.2d at 847. In Green v. County School Board of New Kent County, Virginia, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, the Supreme Court said, 'The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now'. Under HEW regulations, freedom of choice plans are acceptable, so long as in operation such a plan is effective. 45 CFR 80.1-80.13, 181-1-181.76 (1967)
 
 
 [4]
 Adams v. Mathews, 5 Cir., 403 F.2d 181 (No. 26,501, August 20, 1968). See also Graves v. Walton County Board of Education, 5 Cir., 403 F.2d 184 (No. 26,452, September 28, 1968), in which we put school boards on notice that all-Negro schools in this circuit 'must be integrated or abandoned by the commencement of the next school-year.' In Graves we suggested steps, also suggested in this dissenting opinion, that school boards should take in order to carry out the imperative commands of the Supreme Court in Green and of this Court in Adams
 
 
 [5]
 Notably, Jefferson; Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 364 F.2d 896; United States v. Board of Education of City of Bessemer, 5 Cir. 1968, 396 F.2d 44; Montgomery County Board of Education v. Carr, 5 Cir. 1968, 400 F.2d 1, dissenting opinions, 402 F.2d 782
 
 
 [6]
 Particularly Green v. County School Board of New Kent County, Virginia, 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education, 1968, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Monroe v. Board of Commissioners, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, 735; and, earlier, Bradley v. School Board of City of Richmond Va., 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 and Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265
 
 
 [7]
 For example, the Jefferson decree, which was entered in all of the cases included in the three appeals before this Court, provides, in part, as follows:
 Section VIII(a) Faculty Employment. Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on a desegregated faculty. Defendants shall take positive and affirmative steps to accomplish the desegregation of their school faculties to achieve substantial desegregation of faculties in as many of the schools as possible for the 1967-68 school year notwithstanding that teacher contracts for the 1967-68 or 1968-69 school years may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The defendants shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school. * * * Section VIII(c) Past Assignments. The defendants shall take steps to assign and reassign teachers and other professional staff members to climinate the effects of the dual school system.
 
 
 [8]
 Adams, 403 F.2d 188, (No. 26,501, August 20, 1968):
 The court should make findings of fact and state conclusions of law (in each case) as to (1) whether the school borad's existing plan of desegregation is adequate 'to convert (the dual system) to a unitary system in which racial discrimination would be eliminated root and branch' and (2) whether the proposed changes will result in a desegregation plan to 'promises realistically to work now'. An effective plan should produce integration of faculties, staff, facilities, transportation, and school activities (such as athletics) along with integration of students. * * *
 If in a school district there are still all-Negro schools, or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in Green. Boards in such districts are under a duty to take affirmative action toward effective desegregation before the start of the 1968-69 school year or as soon as practicable after the commencement of that year. One alternative to freedom of choice is the assignment of students on the basis of geographic attendance zones. In an attendance zone system (as in a freedom-of-choice system), the school authorities should consider the consolidation of certain schools, pairing of schools, and a majority-to-minority transfer policy as means to the end of disestablishing the dual system. * * * Should the district court in a particular case conclude that the existing freedom-of-choice plan is not working, but that it is not administratively feasible for the board to shift immediately to other alternatives, the court should require the board (1) to take forthwith such steps toward full desegregation as may be practicable in the first and second semesters of the 1968-69 school year, and (2) to formulate and submit to the court, by November 28, 1968, a plan to complete the full conversion of the school district to a unitary, non-racial system for * * * 1969-70; * * * The district court should enter an order by such date as will permit effective review in this Court, if review is necessary, of the court-approved actions the Board will institute in the 1968-69 year as well as the 1969-70 year. * * *
 
 
 [9]
 The hearing was held on November 12, 1968, with the approval of this Court. The Chief Judge of the Western District, with commendable celerity, after Green and before Adams, had called a hearing en banc to determine the effect of that of Green on school desegregation plans in the Western District of Louisiana
 
 
 [10]
 Green, 391 U.S. at 438, 88 S.Ct. at 1694, 20 L.Ed.2d at 724. Here the schools voluntarily adopted no plan. They acted only under the compulsion of court orders
 
 
 [11]
 Green, 391 U.S. at 442, 88 S.Ct. at 1696, 20 L.Ed.2d at 726
 
 
 [12]
 Green, 391 U.S. at 442, 88 S.Ct. at 1696, 20 L.Ed.2d at 726
 
 
 [13]
 Green, 391 U.S. at 442, 88 S.Ct. at 1696, 20 L.Ed.2d at 726
 
 
 [14]
 Bradley v. School Board, 1965, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187; Rogers v. Paul, 1965, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265
 
 
 [15]
 380 F.2d at 394
 
 
 [16]
 United States v. Board of Education of City of Bessemer, 5 Cir. 1968, 396 F.2d 44
 
 
 [17]
 Dowell v. School Board of Oklahoma City, W.D.Okla., 1965, 244 F.Supp. 971, 978, aff'd., 10 Cir. 1967, 375 F.2d 158, 167, cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993; Coppedge v. Franklin County Board of Education, E.D. N.Car., 1967, 273 F.Supp. 289, 300, aff'd., 4 Cir. 1968, 394 F.2d 410. The Court of Appeals for the Eighth Circuit has declined to require this formula, but has suggested it is a standard 'which comports with Brown'. Kelley v. Altheimer, Arkansas Public School District No. 22, 1967, 8 Cir., 378 F.2d 483, n. 24
 
 
 [18]
 Jefferson I, 372 F.2d at 895
 
 
 [19]
 The statistics cited in this opinion are based on the September-October 1968 reports of the school boards filed with the district courts in accordance with Jefferson. Necessarily, I have had to rely on the briefs of the plaintiffs-appellants who used the reports as a basis for their compilation of statistics. There is some overlap; that is, some school districts are defendants in two or more proceedings
 
 
 [20]
 However, in Vermilion all of the other Negro students attend one large all-Negro school. The school board still maintains two all-white schools
 
 
 [21]
 See Jefferson I, 372 F.2d at 876-878; Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1; United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, aff'd., 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709
 
 
 [22]
 The following tables compiled by the district clerks show the improvement or lack of substantial improvement in 1968 over 1967:
 (NEGRO) STUDENTS IN SCHOOLS OF PREDOMINANTLY DIFFERENT RACE (That is, Former white schools)
 TEACHERS IN SCHOOLS OF PRE-DOMINANTLY DIFFERENT RACE