**PLAQUEMINES PARISH SCHOOL BOARD et al., Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 24009.**

United States Court of Appeals Fifth Circuit.

Aug. 15, 1969.

Sidney W. Provensal, Leander H. Perez, New Orleans, La., Luke A. Petrovich, Buras, La., for appellants.

David L. Norman, Frank M. Dunbaugh, Owen M. Fiss, Joseph Ray Terry, Jr., Attys., Dept. of Justice, Washington, D. C., Hugh W. Fleischer, Atty., Dept. of Justice, New Orleans, La., Louis C. La Cour, U. S. Atty., John Doar, Asst. Atty. Gen., for appellee.

Before GODBOLD and SIMPSON, Circuit Judges, and McRAE, District Judge.

SIMPSON, Circuit Judge:

The Commission Council of Plaquemines Parish, Louisiana, and the Parish School Board appeal from the district court's permanent injunction of June 27, 1967, against the Commission Council and the School Board with respect to the desegregation of the public schools of Plaquemines Parish. The district court entered a *Jefferson*-type, freedom-of-choice decree.[1] By preliminary injunction entered August 26, 1966, it ordered the Commission Council to take no action which would prevent the School Board from operating the public schools during the 1966–67 school year in substantially the same manner, except for the desegregation requirements of the order, as it operated the public schools during the 1965–66 school year. The final decree required desegregation of all grades, including kindergarten, for the school year of 1967–68.

The court's decree was exceptionally detailed and provided, among other things, for parity in school curriculum, equalization of fringe benefits for faculty members, revision of the transportation system, reestablishment of previous school hours, reinstitution of bookmobile service at schools which had previously been afforded the service and improvement of general maintenance and repair, including construction of necessary facilities at the schools within the district.[2] Further, the court specifically enjoined the Commission Council and its members from transferring any real or personal property of the Plaquemines Parish Schools for the use of a private school system, and it ordered both the School Board and the Commission Council not to discourage students of Plaquemines Parish from public school attendance and not to encourage students to attend the private schools contemplated. On July 21, 1966, the United States brought this suit[3] against the School Board alone

1. United States v. Jefferson County, 5 Cir. 1966, 372 F.2d 836, aff'd reh. en banc 380 F.2d 385, cert. denied sub nom. Caddo Parish School Board v. United States (1967) 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

2. The trial court's decree also included a direction that the School Board delete the title of "acting principal" and designate permanent principalships at certain schools within the district and an order that the School Board employ a secretary at each school attended exclusively by Negroes. These minor matters may be considered as part of the school equalization aspects of the trial court's decree.

3. The Justice Department notified the School Board through its superintendent of the complaints against the Board in mid-June of 1966. In response, the

pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6(a) and (b). On August 4, 1966, prior to the hearing on a motion for preliminary injunction, on motion of the United States, the district court directed the original defendants to show cause why the Plaquemines Parish Commission Council and its individual members should not be added as defendants.[4] Subsequently, the district court ordered addition of the Commission Council and its members as defendants, and the court also ordered that the Commission Council show cause why it should not be enjoined from transferring or otherwise disposing of any school property and temporarily restrained the Commission Council from making such transfers. As indicated above, the district court granted a preliminary injunction on August 26, 1966, similar in terms to the permanent injunction appealed from in the instant case.[5]

The points raised on appeal divide themselves, roughly, into two categories: (a) objections to procedures adopted by the court below, or to the manner in which the trial court conducted the trial, and (b) attacks upon the findings of fact, conclusions of law and the injunctive provisions of the final decree, in other words, objections going to the merits. We discuss the questions raised in the same order.

### I.

Most of the procedural questions are raised by both the School Board and the Commission Council. First, they complain that this action should have been dismissed for the government's refusal to produce evidence to establish its right to file suit under Section 407 of the Civil Rights Act of 1964, 42 U.S.C., § 2000c–6.[6]

---

Board sent letters to its teachers advising them that contrary to the usual procedure contractual arrangements would be made at some indefinite future time. On July 8, 1966, the School Board transferred all immovable property used by the public schools to the Commission Council. The School Board then instituted a "survey" or "census" to determine enrollment for the coming school year. The Board caused to be distributed purported "freedom-of-choice" forms. The form sent to white parents asked whether they would or would not send their children to integrated schools. A different form was sent to Negro parents asking only that they choose a school for the next year without in any way indicating that they could choose a school other than the traditionally all-Negro schools of the parish. They were not asked if they would send their children to an integrated school. Anyone whose choice reflected something other than the predetermined consensus was urged and often cajoled to reconsider. In short, the School Board conducted a totally spurious survey in an endeavor to support the views of the parish leadership that everyone was happy at his present school and that no one desired integrated schools. The trial court concluded that the census did not reflect freely exercised choices.

4. The prime reason for bringing the Commission Council and its members into the case as defendants was the transfer of

School Board property to the Commission Council and the failure of the Council to that time even to begin negotiations to lease the property back to the School Board. Moreover, the Council's president had made a series of speeches at parish public schools deploring the possibility of integration and urging consideration of private schools. Authority to join additional defendants can be found in the portion of 42 U.S.C. § 2000c–6(a) which reads:

"The Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief hereunder."

5. The preliminary injunction contained findings of fact similar to the ones found in the permanent injunction. The findings of the preliminary injunction were incorporated by reference into the findings on the permanent injunction.

6. The statute reads in pertinent part:
"(a) Whenever the Attorney General receives a complaint in writing—
(1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws

\* \* \* \* \*

and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such com-

The defendants attempted to learn the names of the complainants and the precise nature of their complaints by directing certain interrogatories to the Department of Justice. The Department refused to answer, and the district court declined to order the Department to do so.

■■ Section 407 provides essentially that when the Attorney General is satisfied that he has received meritorious complaints from the parents of the children in a school system to the effect that the children are being deprived of the equal protection of the laws and when he is further satisfied that the parents are unable to initiate legal proceedings themselves, he may, after notifying the School Board and issuing a certificate verifying the existence of the complaints, file suit for or in the name of the United States against such parties and for such relief as may be appropriate. As noted above, the School Board attempted by discovery procedure to learn the names of the complainants and the nature of their complaints. Failing in this objective, the Board argues that it was precluded from facing its "accusers" and thus denied due process of law. The argument. is specious. The accuser is the Attorney General of the United States, and this is a civil suit rather than a criminal one.

While it is true that the School Board might need to know the nature of the complaint in order to begin to remedy conditions to the satisfaction of the Attorney General, there can be no doubt that when the Attorney General issues this certificate, the complaint is that Negro students have been denied equal protection of the law because of the continuance of some characteristics of the dual school system. In fact, the School Board through its superintendent was notified that this was the case. The legislative history of the Civil Rights Act of 1964 makes clear that complaining Negro parents are entitled to the anonymity provided by the Attorney General's notification procedure. The determinations upon which the certification of the Attorney General was based are not reviewable. It would not help this School Board to meet the constitutional obligations it has ignored since 1954 [7] to know the names of the particular complaining parents or the precise language of their complaints. This School Board knows full well the nature of this suit. See United States v. Greenwood Municipal Separate School District, 5 Cir. 1969, 406 F.2d 1086.

■ The Commission Council asserts that it did not receive notice of the government's intention to proceed on

plaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board * * * and after certifying that he is satisfied that such board * * * has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action * * * against such parties and for such relief as may be appropriate * * *

"(b) The Attorney General may deem a person or persons unable to initiate and maintain appropriate legal proceedings within the meaning of subsection (a) of this section when such person or persons are unable, either directly

or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; or whenever he is satisfied that the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property."

7. In this year, the Supreme Court handed down the landmark decision of Brown v. Board of Education (Brown I), 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Brown v. Board of Education (Brown II), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the implementation decision followed one year later. The trial court found, and defendants do not dispute, that the School Board traditionally (until the filing of this suit) operated a segregated school system in which students and teachers were assigned to schools on the basis of race.

a motion for preliminary injunction as required by Rule 65(a), Federal Rules of Civil Procedure.[8] This argument fails for a number of reasons. First, it should be noted that the district court's temporary restraining order and the order to show cause, together with the amended complaint, were personally served on the Commission Council and its individual members. These papers fully advised the Commission Council and its members of the nature of the claim against them and of the plaintiff's application for a preliminary injunction. Nor can lack of actual notice be alleged since the president of the Commission Council appeared as counsel for the School Board from the inception of the proceedings below. Moreover, issues raised relevant to the granting of a preliminary injunction are irrelevant to an appeal from the granting of a permanent injunction. 7 Moore, Federal Practice, § 1651; Monfort v. Korte, 7 Cir. 1939, 100 F.2d 615, 617. An order to show cause generally will constitute sufficient notice for the motion for preliminary injunction. 3 Barron & Holtzoff Federal Practice and Procedure (Wright Ed. 1958) § 1433, p. 490. We have no doubt that the appellant Commission Council and its members were on specific notice as to why they were joined as defendants, the relief sought against them and the request for temporary injunction. Finally, Rule 65 (a) does not specify the particular type of notice required in order properly to bring defendants in an injunction proceeding before the trial court. The sufficiency of the written and actual notice is a matter for the trial court's discretion. We find here no abuse of that discretion.

3. Rule 65(a) reads as follows:
 "(1) Notice. No preliminary injunction shall be issued without notice to the adverse party."

9. The record contains inferences that the School Board is not particularly independent of the wishes of the Commission Council. The testimony of ex-School Board member Dallas Picou is particularly revealing. He stated that the motion to

■■ The Commission Council next urges that it was entitled to the right of trial by jury, because the government's suit against it was in the nature of a suit to try the title to land. The government's motion to enjoin the Council, as owner of public school properties, from transferring those properties so as to interfere with the other orders of the court is the only possible foundation for this ingenious but unconvincing argument. This school desegregation suit is strictly an action for injunctive relief from a denial of constitutional rights; it cannot be remotely considered as a suit to try title to land. There is no right to trial by jury in injunction proceedings relevant to school desegregation brought under Section 407, or otherwise.

■ The Council also argues that because it has completed negotiations for lease of the school property to the School Board that the motion for a mandatory injunction should have been dismissed for mootness. We do not agree. The conduct of the defendant Commission Council throughout this controversy supplies ample proof of the need for it to be under the onus of a court order with respect to its dealings with the defendant School Board. Without the grant of injunctive relief, a strong probability remains that the Commission Council, because of its powerful position in Plaquemines Parish, would once again induce the School Board to transfer school properties back to the Council. Even though violation of constitutional rights may have temporarily ceased, there are ample grounds for injunctive relief.[9]

■ The appellant Commission Council also contends that the trial

transfer the property from the School Board to the Commission Council was rushed through with virtually no debate after Leander Perez, Sr., former president of the Council, told the School Board the transfer was necessary to fight the integration suit. Picou testified to other instances in which the School Board followed Council suggestions without discussion.

judge should not have denied its motion to recuse. We are convinced that the motion was properly denied. The motion to recuse in this case consists of nothing but repeated conclusions of bias and is supported by no facts other than a recitation of adverse rulings and findings of fact. While undoubtedly some friction developed during trial between the trial court and the counsel for the Commission Council, usually sparked by counsel's remarks or behavior, this in itself is grossly insufficient to show the quality of prejudice necessary before a motion to recuse should be granted. We note that the record reveals several instances in which the trial court made rulings favorable to the Commission Council over the objection of representatives of the Justice Department. The nature and subject matter of the proceedings, the persons involved, made it almost inevitable that firmness and sternness be used from time to time by the trial judge. No jury was present. It is to the credit of the trial judge, rather than otherwise, that he carried out his function in this proceeding as he did. A last ditch, last hour stand in defense of the racial purity of the public schools of Plaquemines Parish, could hardly be expected to pass into history without producing some fireworks. The way in which control over the trial was preserved intact by the trial judge we consider commendable.

 Next questioned is the trial court's alleged use of HEW's guidelines in fashioning a decree for this school district. The School Board contends that since it has never received federal funds,

the guidelines cannot be applicable. This argument is baseless principally because there is no showing that the trial court relied on the HEW guidelines in fashioning its decree. They were not applied as such. Whatever sub silentio use the trial court may have made of the guidelines was justified under *Jefferson*, which deals in terms of constitutional imperatives.

Other procedural objections made by the Council are totally devoid of merit. Although we have considered them, they do not warrant discussion in this opinion.

## II.

 We turn to a consideration of the merits. The trial court upon extensive findings of fact and conclusions of law entered a decree enjoining the Plaquemines Parish School Board from operating a racially segregated public school system. The trial court ordered the School Board to desegregate by use of the *Jefferson*-type, freedom-of-choice method. We do not understand appellants to question the propriety of the entry of the *Jefferson* decree; they realize that *Jefferson*-type freedom of choice is the minimum step that a school board can take to carry out its constitutional obligation of eradicating the dual school system.[10] Rather, appellants question the district court's findings of fact and conclusions of law based thereon which provide the basis for more far-reaching relief. They have one central complaint concerning all the various parts of this decree which may be summed up as a feeling that the federal district court and

10. The United States Supreme Court has cast doubt on the continued utility of freedom-of-choice plans to achieve the elimination of the dual school system in its recent important trilogy of decisions dealing with various desegregation plans. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of the City of Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

We have not hesitated to require adoption of some plan other than freedom-of-choice when its operation produces only minimal desegregation and vestiges of the dual school system remain. See, e. g., Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181; United States v. Greenwood Municipal Separate School District, supra; Anthony v. Marshall County Board of Education, 5 Cir., 1969, 409 F.2d 1287 [April 15, 1969]; United States v. Indianola Municipal Separate School District, et al., 5 Cir. 1969, 410 F.2d 626 [April 11, 1969].

the Justice Department have in conjunction virtually preempted the operation of the Plaquemines Parish government and of the Plaquemines Parish School system in violation of the dictates of State of Louisiana v. McAdoo, 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914).[11] For reasons that we will develop below, we reject the contentions of both the School Board and the Commission Council and affirm each provision of the district court's decree, with the exception of one provision which we determine should be deleted.

The Commission Council attacks all but one of the trial court's findings of fact.[12] Curiously, it makes no reference in its brief to the provision of Rule 52(a) of the Federal Rules of Civil Procedure that a trial court's findings of fact will be set aside on appeal only if they are clearly erroneous. Appellants' attack on each of the findings of fact made by the trial court consists largely of a series of conclusory statements that the trial court was wrong. Rarely, do appellants attempt to set out with specificity any evidence to support the proposition that the trial court was mistaken, much less that it was clearly erroneous. No fur-

ther discussion of appellants' attack on the trial court's findings of fact is necessary, but we feel that a review of the evidence amply supporting the trial court's findings would be helpful in understanding the extensive relief granted by the trial court which we affirm today.

Certain of the trial court's findings relate to the financial situation obtaining between the Commission Council and the School Board and the financial status of the school district in general. The trial court found that prior to the 1966–67 school year, it has been the general practice of the Commission Council to make available substantial sums of money to the School Board for the operation of the public schools of the parish. For example, in 1965–66, the Commission Council transferred $673,580 to the School Board's general fund and $550,000 to the School Board's construction fund. It is undisputed, as the trial court found, that for the 1966–67 school year there had been no transfers of moneys from the Commission Council to the School Board.[13] In addition, the Plaquemines Parish School Board has certain funds available to it from the State of Louisiana.[14] Uncontradicted testimony shows

11. That case, decided over fifty years ago, obviously has not the slightest application to limiting the power of a district judge to fashion an appropriate decree in a desegregation case. In *McAdoo*, the only issue was whether the duties of the Secretary of the Treasury with regard to collection of sugar tariffs were ministerial or executive and thus discretionary. The court concluded that they were discretionary and that the courts could not order the Secretary to perform a discretionary act.

The School Board's duty, on the other hand, is not discretionary. It has the affirmative duty to end the dual school system. Insofar as its activities have any bearing on the affirmative duty of the School Board, the Commission Council's activities are not discretionary either. It must not interfere with the desegregation of the schools, and it must aid in that process whenever appropriate.

12. While questioning the trial court's conclusions of law and asserting the court's lack of authority to enter the broad

desegregation decree, the School Board makes no real effort to rebut the trial court's extensive findings of fact from the record. The obvious reason is that the findings are based on the record and are unassailable.

13. Not only did the Commission Council not transfer any funds to the School Board for the 1966–67 school year, but the Council has received $40,000 per month from the Board as consideration for execution of the leases of school properties transferred to the Commission Council by the School Board immediately prior to the filing of this desegregation suit. The School Board, at present continues to have this monthly obligation which must constitute a considerable drain on resources necessary to operate the public schools.

14. The School Board receives money from the State Department of Education Equalization Fund. This disbursement is apparently prorated to school districts depending on size of enrollment. Of course, other state funds are available to

that the School Board stands to lose in the neighborhood of $715,000 in state funds because of the decreased enrollment in the school district brought about by the establishment of private white schools. The trial court found that for the past several years, the School Board has refused to implement any salary increases for either its white or Negro professional staff and teachers, although it received $61,901.50 for salary increases from the State Department of Education. In addition, the Commission Council continues to receive large sums of money from the Refuge Revenue Sharing Act. Title 16 U.S.C. § 715s. These funds must be spent on schools and roads; the Council in the past has expended nearly three million dollars of this money on the parish schools. The record reveals a consistent disinclination by the School Board and the Commission Council to avail themselves of federal financial education assistance through such programs as the Federal Lunch Program, the Elementary and Secondary Education Act of 1965 or the National Defense Education Act.

The trial court also made certain findings with respect to the problems of the public school system brought about by the establishment and official support of private schools in the parish. The trial court found, based upon undisputed testimony, that teachers who left the public school system to teach in the private schools of the parish removed certain educational materials from the public school buildings.[15] There was also much testimony concerning the removal of playground and athletic equipment from public schools of the parish by the director of the Plaquemines Parish Recreation Association, an agency of the Commission Council. There is additional testimony concerning the removal of textbooks from the public school system and their transfer to private schools, despite the fact that the record indicates a drastic shortage of textbooks at remaining all-Negro public schools within the parish.[16] The Commission Council has openly approved, and the School Board has done nothing to stop, this transfer of equipment, textbooks and other necessary educational materials from the public schools of the system to the private schools.

The mere operation of private schools in the parish has hampered activities of the public schools. Children at the integrated Belle Chasse School were denied entrance to their own gymnasium. Rather than playing basketball as was the general custom in winter months, they instead ran track despite the generally cool weather. Use of the school auditorium for assemblies and other school gatherings was also denied the Belle Chasse School, possibly because those facilities were used by the private school in the area.[17]

the School Board, including funds which the School Board has refused to use to implement salary increases for teachers and staff.

15. Mrs. Humphrey, a teacher at the Bootheville-Venice School, testified that she had personal knowledge of the removal of a record player, an aquarium and several maps or charts from the school by teachers who defected to the private schools. The principal of Port Sulphur School testified that cumulative folder records of children who transferred to the private schools were removed from the public schools causing much administrative difficulty.

Mr. Tinsley, the acting superintendent, testified that he was informed of the removal of educational equipment, including

a piano, and yet had not found time to investigate these matters.

16. A sixth-grade student at the Sunrise School testified that he had only one textbook for six courses. He stated that no one in his class had a speller and that the topical *Weekly Reader* served as a textbook for geography and history. Other testimony vividly illustrates the textbook shortage at several of the public schools.

17. The secretary of the Belle Chasse Parent-Teacher Association testified that she was told the gymnasium, an integral part of the school facilities, was "not available" for an honor assembly to recognize outstanding students. The defendants offered no reason for the nonavailability of school facilities to students, teachers

Nevertheless, this is not the full extent to which the Commission Council and former members of the School Board have lent their prestige to the private school system and deliberately attempted to weaken the public school system of the parish. The most distressing aspect from the standpoint of the school children of the parish is the depletion and demoralization of the teacher corps brought about by a variety of factors. The School Board neglected to furnish white teachers of the public schools with any contracts for the 1966–67 school year bringing about a situation of confusion, uncertainty and anxiety among these parish teachers. The record reveals no excuse whatsoever for the School Board's action other than an attempt to confuse the situation with regard to the public school teachers and cause them either to join the private schools or seek employment elsewhere. The School Board would have us believe that the actions of the Justice Department in demanding certain records and reports has handicapped it with regard to the clerical duties of formulating and mailing out teacher contracts. This plea has a somewhat hollow ring when the record reveals that every Negro teacher remaining in the public school systems of the parish has signed a contract and is assured of his position for the 1966–67 school year. Nor has the recruitment of public school teachers for the private schools been done exclusively outside of school hours. The evidence supports the trial court's finding that ex-principals of the public school system who have moved to private schools used their former offices in the public school system to recruit public school teachers while public school was in session.[18] Many teachers testified that they left a meeting of teachers called by the attorney for the School Board and the acting superintendent of the public schools in a very depressed state of mind, despairing of even the existence of public schools in the future. There is no question but that an attempt was made to give public school teachers the idea that the public schools of Plaquemines Parish probably would be closed if not the next school year, at least in the foreseeable future. Teachers were led to believe that the only bright prospects, including increased pay and fringe benefits, were in the private school system being constructed.[19]

Complementary to their efforts to build up the private school system, members of the Commission Council and the School Board saw fit to disrupt previous routines and, in general, make things very difficult for the operation of the public schools that remained in Plaquemines Parish. The public school transportation system in the parish during the 1966–67 school year can only be described as chaotic. New buses were purchased for the exclusive use of the private schools, and the public schools

and parents. We note that one of the proliferating private schools was located very close to the Belle Chasse School.

18. Several witnesses testified that officials or staff of the private schools were seen driving clearly-marked Driver Education cars which the record shows were property of either the School Board or the Commission Council.

19. The attorney for the School Board and the acting superintendent both sought to minimize the negative impressions their statements obviously made on the various teachers who testified. We do not quibble over what precise words were employed or what the intent of the speakers might have been. We cannot ignore, however, the obviously demoralizing effect this meeting had on many of the public school teachers.

Mrs. Humphrey (see note 15, supra) stated that she was told she might not get paid if she remained with the public schools. The records shows also that no regular teaching meetings were held in the parish the entire 1966–67 school year. Adding these factors to the evidence that there were no salary increases, that teachers in the private schools were paid more than public school teachers and that no contracts were mailed out to the white teachers for the next school year, we can only conclude that Plaquemines Parish public school teachers would certainly be justified in concluding that the outlook would be dim indeed for those teachers who stubbornly refused to move to the private schools.

were left to make do with outmoded vehicles. Even the transportation provided came nowhere close to that provided in previous years. Bus schedules and routes were changed; as a result, pupils desiring to attend the public schools were required to arise earlier in the morning and walk farther than ever before in order to reach the public schools of the parish by bus. At least one teacher and a principal were told that public school transportation was no longer available for important classroom field trips and for extracurricular activities at two of the schools. One teacher testified that school bus drivers of the parish believed that they were first and foremost employed by the private school system and that they were merely doing public school students a favor by providing any transportation whatsoever for them. Undoubtedly, the expense of providing and scheduling of transportation for several private schools severely affected the operation of the public school system of the parish.

The change in transportation schedules necessitated the public schools opening for classes 20 to 30 minutes earlier than they had the previous years, a practice which testimony shows caused great havoc in homes where more than one child went to school and the parent had to drive them to school before going to work. No administrative reason has been cited for the change in school hours. It appears to be a valid assumption that the change was brought about for the purpose of disrupting the previous routine of the public schools.

The evidence in the record amply supports the trial court's finding that the School Board and the Commission Council failed to adequately maintain and improve the grounds of the public schools.[20] A football field at one of the previously all-Negro schools is unusable because the grass has never been cut. Some of the damage remaining from Hurricane Betsy in September 1965 has not been adequately repaired.[21] In addition, the School Board apparently let lapse construction work supposedly being done on the Buras School, thus producing a situation in which elementary-age school children must cross adjacent to incomplete construction on the way to eat every day. The evidence is particularly strong regarding the dilapidation of the Negro school facilities. None of these schools have any significant athletic facilities; many of them need various repairs which have not been provided by the School Board and the Commission Council. In short, there is a plethora of testimony in this record indicating that the School Board and the Commission Council and their maintenance personnel have ignored completely or have at best reacted very slowly to repeated requests for improvements and repairs on the grounds of the public schools.

The spotlight focused by this desegregation suit brought to light many inequities existing between the formerly all-Negro schools and formerly all-white schools of the parish concerning curriculum and other matters. None of the Negro schools in the parish were provided with kindergarten programs as were the white schools. The Negro children were unable to avail themselves of driver education and handicapped Negro children were not given any special instruction. Industrial arts, a course of study that should be particularly important to

20. The Commission Council argues that it cannot be directed to repair and improve school grounds and facilities since the leases with the School Board expressly provide that the Board is responsible for such service. However, former Superintendent Moncla testified that the Council traditionally maintained supervision of the major repair needs of the public school system.

21. Mr. Hardin, a coach at the Bootheville-Venice School, testified that the school's gymnasium was in bad condition with leaky walls and ceiling and a rising floor. Mr. Simmons, acting principal of the school, testified it was in bad need of repairs. Mrs. Tony, home economics teacher at Buras School, testified to numerous problems with inadequate wiring and other equipment necessary to effective conduct of her class.

members of low income groups, was not offered or was offered in only a nugatory form at the formerly all-Negro schools of the parish. Exhibits and testimony show that professional guidance services and adult education programs were staples of the white public school program, but did not appear at Negro schools in the parish. The response of the School Board to the pressures engendered by this suit was not to institute such programs as we have mentioned above at the Negro schools in the Parish. Instead the Board dropped all such programs from the white schools. Such a response, of course, did bring about equalization between Negro and white public schools, but at a cost of greatly damaging educational opportunities in the parish.

The appellants have withdrawn or greatly changed other programs and practices formerly employed in the public school system. The parish had provided a school lunch program charging ten cents per child for a hot lunch in previous years. For the 1966–67 school year, the parish raised the price to twenty-five cents, a 150 percent increase which competent testimony shows greatly reduced the number of school children able to buy a hot lunch. Financial distress was given as the reason for the increase in school lunches, but this is hardly a convincing excuse when it is considered that the parish neglected all forms of federal supplement for its school lunch program.

Formerly, the public schools of the parish were served by a bookmobile, a traveling branch of the Plaquemines Parish Public Library, an agency of the Plaquemines Parish Commission Council. Bookmobile service to previously all-white schools of the parish was ended in the 1966–67 school year. This was done in spite of evidence that the Bootheville-Venice School was without library facilities and that all the schools previously made great use of the bookmobile service. It is also unquestioned that bookmobile service was provided routinely to all private schools in the parish.

All of the above findings made by the trial court are amply supported by testimony and exhibits in this record. The appellants make only conclusory statements that the findings are not true and accurate. These fact findings impelled conclusions of law by the trial court which appellants attack as an abuse of the court's discretion, an invasion of local government prerogatives and a violation of the Elementary and Secondary Education Act of 1965, Public Law 89–10.

We easily dispose of the supposed conflict with the provision of the Act prohibiting federal control of education. Elementary and Secondary Education Act of 1965, Public Law 89–10, Section 604, Title 20 U.S.C. Section 884. The legislative history is clear that language in this Act forbidding federal interference in the local schools refers only to management, curriculum dictation and other details of local school administration that the federal government is not equipped to handle. The Act was not intended to have any relation whatsoever to the provisions of the 1964 Civil Rights Act relating to desegregation of the public schools and implementing the mandate of the *Brown* decision of 1954. There is not the slightest indication that Congress meant to constrict the Executive Branch's enforcement of the school desegregation decisions and statutes when it passed either the 1965 act, or the 1966 and 1968 amendments thereto.

As stated earlier, the School Board and the Commission Council do not quarrel with the institution of the *Jefferson County*-type, freedom-of-choice decree in this case. The School Board does not object to the conclusions of the trial court requiring that new schools be located and existing schools be expanded with the objective of eradicating the vestiges of the dual system and increasing integration.[22]

22. The Council does object to the requirement that new school location and expansion of existing facilities be conducted so as to increase integration and eliminate the dual system. The Council cannot contest this action of the trial court as such a provision has been uniformly included in numerous other district court

The appellants do not object to the trial court's decree that scholarships for additional studies and other fringe benefits provided for teachers such as housing, rent supplements and utilities payments must be provided to teachers of the public school system on a nondiscriminatory basis. Appellants' objections relate primarily to the additional aspects of the trial court's decree which require them to take the affirmative steps that are necessary to preserve the public school system of Plaquemines Parish and to operate it on a nondiscriminatory basis. Appellants also strenuously object to the prohibitory aspects of the trial court's decree which enjoin them from any further action tending to debilitate and disrupt the public school system or tending to aid the establishment of a private school system. We find that both the affirmative and prohibitory aspects of the trial court's decree are justified by the court's findings of fact, the testimony in this case and prior decisions of this and other courts.

The trial court concluded that the school board must establish remedial programs to assist students who previously attended all-Negro schools when those students transfer to formerly all-white schools in the parish under the freedom of choice provisions of the decree. The remedial programs, ordered by the district court, are an integral part of a program for compensatory education to be provided Negro students who have long been disadvantaged by the inequities and discrimination inherent in the dual school system. The requirement that the School Board institute remedial programs so far as they are feasible is a proper exercise of the court's discretion.

Appellants object to the trial court's requirement that meaningful school equalization be achieved by the addition of courses at formerly all-Negro schools rather than the deletion of courses at formerly all-white schools. The court has required that kindergarten, driver education and industrial arts be offered at the formerly all-Negro schools as they were offered in one form or another at formerly all-white schools prior to the initiation of the instant suit. Meaningful school equalization relief is clearly within the discretion of the district court. Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682 [No. 23255, March 6, 1969]; United States v. Board of Education of Bessemer, Ala., 5 Cir. 1968, 396 F.2d 44. The district court was justified and well within its discretion in ordering the defendant Commission Council and the defendant School Board to construct athletic fields with backstops and to provide other reasonable conditions for organized sports at the three schools previously attended exclusively by Negro students. The district court ordered other specific maintenance and repair work, including repair of broken locks and windows at Buras and Bootheville-Venice Schools and replacement of fallen blackboards at the Sunrise School. The court in its discretion ordered the Commission Council to take steps to repair athletic fields, spectator stands and lights which were shown to be in dilapidated condition at schools in the parish.[23] All the repairs and maintenance work ordered were within the trial court's discretion in fashioning a reasonable program to equalize the schools within the parish so that the free choice of schools will be meaningful.[24]

decrees in desegregation cases in this circuit. If the Council is arguing that it has no say in such matters, the evidence shows overwhelmingly to the contrary.

23. The testimony of Bootheville-Venice coach Hardin is again enlightening with regard to poor athletic facilities at that school. The acting principal at Buras School testified about problems the school's state championship football team had in scheduling play-off games.

24. Free choice of schools can have no meaning where the choice is between schools which maintain athletic facilities and attractive grounds and schools which have no athletic facilities and grounds that are in a state of disrepair.

The district court took additional action to remedy the chaotic conditions brought about in the public school system by the School Board and Commission Council. The court ordered the School Board and the Commission Council to reinstitute a transportation program for public school students substantially similar to that formerly operated in the parish. To gain compliance with this order, it was necessary for the district court to enjoin the School Board and the Council from operation of the transportation system primarily for the convenience of private schools. The court required the Commission Council and the Board to operate a transportation system primarily for the convenience of students of the public schools. Only incidentally, insofar as it may not interfere with orderly and efficient public school transportation, may students be transported to the private schools that have been established in the parish. This is certainly a reasonable requirement. If the Commission Council and the School Board are in the business of operating schools in the parish, they must be in the business of operating *public* schools.

The court ordered the School Board to reinstitute a school lunch program similar to that obtaining in the parish in previous years with a hot lunch provided at each school in the parish at a reasonable price not to exceed thirty cents per child and preferably at the ten cents per child cost that prevailed prior to the integration controversy. This is a reasonable requirement, and federal funds are available to aid the school district if that should become necessary.

The court also ordered that bookmobile service be reinstituted at the previously all-white public schools. If the parish Commission Council operates a bookmobile service as it has done in the past, it must not operate it solely for the benefit of the private schools. The Council cannot argue that it would be a hardship to operate the bookmobile service for the public schools since it has done so consistently in the past and since it continues to operate the service for private schools within the parish. Certainly, the testimony in this record makes clear the dire need for library books at certain schools within the parish.[25]

It was also within the court's discretion to order the School Board to direct schools to start classes at the same time they had begun previous to the integration controversy and the growth of private schools. The School Board offered no rational reason for advancing the starting time of the public schools. The only reason apparent from the record is that this was done for the convenience of the private schools and the discomfiture of students remaining in the public schools.

Of course, the district court was justified in ordering the School Board to provide students at Belle Chasse High School with full access to all facilities located at that high school and to insure those students the opportunity to engage in extracurricular activities. The testimony reveals that school authorities denied students attending the Belle Chasse School the opportunity to participate in organized athletics, to hold dances as in previous years, to publish a school newspaper and to have graduation exercises as they had in the past. No good reason for the abandonment of these past practices was advanced by the School Board and the Council. The record, in fact, indicates that many of the extracurricular activities were done away with because of fear of the consequences of racial integration in the school. Needless to say, this is not a valid educational criterion. We remind the Board and the Council that full integration of the schools means full integration of all services, facilities, extracurricular activ-

25. We will not detail the many instances where teachers and principals testified to inadequate library facilities, except to note that one teacher borrowed books herself at the main branch of the parish library in order to effectively conduct her class. Testimony indicated that the Bootheville-Venice School did not even have a library.

ities and programs. United States v. Jefferson County, supra; United States v. Board of Education of Bessemer, Ala., supra; Henry v. Clarksdale Municipal Separate School District, supra.

We now discuss two of the more controversial aspects of the trial court's decree. The first of these relates to finances. The trial court ordered the School Board to finance the operation of the system so as to satisfy the various provisions of the overall decree. The School Board can only finance the non-discriminatory operation of the school system if moneys are made available to it from the general funds of the Commission Council as has been the traditional operation of this system.[26] Appellants contend that a district court does not have the power to order an agency of local government to spend funds in any manner or to raise funds for any purpose. Unquestionably this is too restrictive a view. The Supreme Court declared in Griffin v. County School Board of Prince Edward County, Virginia, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), that district courts have the power to require the persons or agencies operating a public school system to levy taxes in order to raise funds adequate for the operation and maintenance of a public school system without racial discrimination. In the present case the district court required the School Board to make application for financial aid for programs operated by the government whenever this was necessary to operate the system in accordance with the terms of the court's order.[27]

A most appealing argument can be made that if the district court has the power to require a county board to levy taxes for the operation of schools, it also has the power to require the School Board to accept proffered financial assistance from federal agencies if such assistance is needed to comply with a court desegregation order. The district court's reasons for making the requirement quoted in footnote 27, supra, in the context of the circumstances here present, and in view of the intransigent attitude of the Parish Council and its domination of the School Board, were strong reasons. Inventiveness was called for and the district judge did not hesitate to originate and apply novel methods. But *Prince Edward*, supra, must be considered a unique case. The Prince Edward County schools were closed and the court directed that they be reopened and that taxes be levied and collected to operate them. The subjects of levy, tax rates, and collection methods were left to the commands of state law under state standards. Here the provision quoted in the footnote (27) goes beyond *Prince Edward* as to source, manner and controls accompanying the funds. Further, the "necessity" for funds is to be measured against the quality of instruction, equipment, books and transportation. We conclude that approval of the provision as now broadly written is not justified. The district court is directed upon remand to modify its permanent injunction by deletion of this provision. This direction is without prejudice to the right of the district court in the future in a specific situation as to specific funds to require that application be made when it is shown that the board has failed to apply for such funds as part of a plan or scheme to impede the end of the dual system of schools, or to discriminate against Negro children. The district court is free to re-examine the present

26. See note 20, supra.

27. The portion of the trial court's decree dealing with finances is as follows:
"The School Board shall finance the operation of the system in accordance with the requirements of this Order.
1) Whenever necessary to operate the school system in accordance with the terms of this Order, the defendant School Board shall make application for financial aid from programs operated by the United States Government, including the Federal Lunch Program, the Elementary and Secondary Education Act of 1965 program, and the National Defense Education Act program.

record to determine if such relief is justified with respect to the School Lunch program, or other specific programs upon motion.

The court's injunctive decree will still have the effect of directing the Commission Council to make funds available to the School Board as it has in the past. This will result from the Council's compliance with the court's order that it not assist the private school system in such a manner as to interfere with the public school system and that it support the desegregation plan drawn by the district court. Necessarily, to operate a non-discriminatory system of public schools, curriculum and maintenance equalization programs and transportation programs required by this court's order, the Commission Council will once again have to transfer substantial amounts of funds to the School Board.

■ The defendant Commission Council objects most strenuously to the portions of the district court's decree enjoining its encouragement of a private school system and its attempts at debilitating the public school system. The Commission Council is specifically forbidden to dispose, transfer, convey or sell any real (immovable) property or personal (movable) property owned, leased or occupied by the School Board to be used for educational purposes by a school system other than the Plaquemines Parish school system, or in any other way interfere with the desegregation order entered by the court. The findings of fact on such matters as recruitment of public school teachers, removal of needed classroom educational materials and removal of athletic equipment from the public schools of the parish by agents of the Commission Council certainly warrant this provision of the decree. We venture to say that if the Commission Council complies with the letter and the spirit of the district court's mandate regarding the duty positively to support the public schools, it will not have to worry about the negative aspects of the injunction.

■ Finally, the Commission Council objects to the limitation on it or its officers from encouraging any students living within Plaquemines Parish to enroll in schools not operated by the School Board and from discouragement of any students living in Plaquemines Parish from attendance in the Plaquemines Parish public schools.[28] The appellants allege that this aspect of the court's order violates the First Amendment rights of the defendant members of the Council and the School Board. This might be a viable argument if the order were directed at these parties acting in their individual capacities. However, they are only forbidden to encourage or discourage students in their official capacities as members of the Commission Council and their official capacities as members of the School Board, and we thus see no First Amendment violation. The Board and the Council should remember that it is the *affirmative* duty of the school boards in this circuit to eradicate the last traces of the dual school system. Surely, the dismantling of this long-entrenched system cannot take place if public officials actively are attempting to undermine the very existence of the

28. The record provides ample support for these provisions of the trial court's decree. Besides the teachers' meeting and illegal recruitment of public school teachers already mentioned, the Council and the School Board cooperated in calling and conducting meetings at four formerly all-white high schools in the parish. Leander Perez, Sr., president of the Commission Council, addressed each of these meetings and informed the gatherings that he strongly opposed integration of the public schools. Several witnesses testified that Perez stated the parish might consider the establishment or at least support of private schools modeled along the lines of the systems attempted in Prince Edward County, Virginia. Appellants argue that Perez made no such statements, but the trial court was entitled to credit the great weight of testimony that Perez did announce his opposition to integrated public schools and possible support for private schools.

public schools by word or deed. We find this portion of the decree proper and justified by the evidence.

From what we have said, it is clear that the trial court's findings of fact not only are not clearly erroneous, but are supported by substantial evidence. The decree entered by the trial court and as now modified by this opinion is not too sweeping or too broad but is a just exercise of its discretion in fashioning a decree that will effectively desegregate the public schools of Plaquemines Parish in accordance with the Constitution. This record reveals a shocking disregard for the welfare of public school students, their teachers and school buildings by responsible officials of this parish.[29] Moreover, the record reveals deliberate attempt to subvert the public schools and to place in their stead a system of private schools supported by parish funds and property and attended solely by white students. Such a scheme is constitutionally intolerable. The trial court was entitled to enter a decree so detailed that no such efforts can be made by the Commission Council or the School Board in the future. We think that if the Commission Council and the School Board act in good faith to bring about equality of educational opportunity in Plaquemines Parish, they will have no difficulty complying with both the positive and negative aspects of the district court's decree.

Modified, and as modified, affirmed.

29. In good measure, due to the activities of the Commission Council and the School Board, enrollment at the formerly all-white schools in the parish decreased drastically as the following table indicates:

| | 1965–66 | Sept. 1966 |
|---|---|---|
| Belle Chasse High School | 1,632 | 125 |
| Buras High School | 1,895 | 1,175 |
| Port Sulphur High School | 935 | 721 |
| Bootheville-Venice High School | 821 | 500 |
| Woodlawn High School | 247 | 0 |

The School Board's brief begins by stating: "This is not a typical school integration case * * *" This statement could not be more true. This Court recalls no record in any school case which revealed so graphically official attempts to destroy a public school system and to flout the mandates of the United States Constitution as interpreted by the federal courts.