**UNITED STATES of America,
Plaintiff, Appellee,**

v.

**MASSACHUSETTS MARITIME
ACADEMY, et al., Defendants,
Appellants.**

**No. 84–1528.**

United States Court of Appeals,
First Circuit.

Heard Nov. 5, 1984.

Decided May 16, 1985.

Kenneth H. Tatarian, Boston, Mass., for defendants, appellants.

Mark L. Gross, Dept. of Justice, Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., William Bradford Reynolds, Asst. Atty. Gen., and Walter W. Barnett, Dept. of Justice, Washington, D.C., were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

This appeal by the Massachusetts Maritime Academy ("the Academy") is from an injunction issued by the district court after deciding that the Academy had intentionally discriminated against women in recruiting and admissions policies. We affirm.

* Of the District of Massachusetts, sitting by desig-

## I. BACKGROUND.

The Academy was founded in 1891 by the Commonwealth of Massachusetts as the Massachusetts Nautical Training School, "for the instruction and training of pupils in the science and practice of navigation," 1891 Mass.Acts, ch. 402, section 3. Today it prepares students primarily for careers in the United States Merchant Marine, offering a bachelor of science degree in marine engineering and marine transportation.

The Academy has received federal aid since its inception. *See* 1891 Mass.Res., ch. 4. Under a Joint Congressional Resolution issued in 1941, it and the other state maritime academies have also been subject to extensive federal regulation. H.R.J.Res. 139, 55 Stat. 607 (1941). Thus, as a condition for receiving federal funds and using United States vessels, the Academy must observe federal minimum standards with respect to entrance requirements, instructional staff, training facilities and the like. *Id. See also* the Maritime Education and Training Act of 1980, 46 U.S.C. § 1295c(f)(1)(B) (Supp.1984).

Under pre-1973 regulations of the federal Maritime Commission, an entrant to a state maritime academy had to "be a male citizen of the United States." 6 Fed.Reg. 5755 (1941) (codified at 46 C.F.R. § 293.71 (1941)). This requirement was eliminated in revised regulations promulgated by the Secretary of Commerce on April 24, 1973, a stated purpose of which was to "delete improper restrictions on age and sex." 38 Fed.Reg. 10,087. Federal regulations have since allowed state maritime academies to recruit without limitation as to gender. *See* 46 C.F.R. § 310.6(a)(1) (1984). Following the 1973 regulatory change, most state maritime academies began to admit women almost immediately. The Academy did not admit women, however, until the fall of 1977.

In the fall of 1974, Maryann Kazukonis, at that time a senior high school student, expressed her interest in applying to the

nation.

Academy for admission as a cadet. She met with Thomas S. Lee, the Academy's Director of Admissions, who informed her in no uncertain terms that women were not accepted at the Academy.[1] She was also told that her academic record was deficient because she lacked one of the mathematics courses required for admission. Ms. Kazukonis filed complaints with the Attorney General of the United States and with the Massachusetts Commission Against Discrimination. On August 14, 1975, the Attorney General, pursuant to the dispositions of Title IV of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000c *et seq.*, notified the Board of Trustees of the Massachusetts State Colleges ("the Board"), the body then responsible for the administration of the Academy, that in his view the Academy's single-sex admissions policy violated the equal protection clause of the fourteenth amendment of the United States Constitution.

In response to the Attorney General's letter, the Academy appointed an ad hoc committee in November 1975 to study the matter. Mr. Lee vigorously opposed admitting women, touching off a prolonged debate within the committee.

By April 30, 1976, the Academy had yet to reach a decision. On this date the Attorney General brought this action alleging unconstitutional discrimination. Named as defendants were the Academy; its President; its Director of Admissions, Mr. Lee; the Board of Trustees of the Massachusetts State Colleges; and the Board's individual members. The Attorney General sued under purported authority of 42 U.S.C. § 2000c-6(a) and (b).[2] He attached to his complaint the certificate required by that section. As in his communication to

---

1. According to Ms. Kazukonis's testimony, she was told by Mr. Lee that the only way she would be admitted to the Academy was by going to Sweden and undergoing a sex change operation.

2. This statute, part of Title IV of the Civil Rights Act of 1964 (with the provision against sex discrimination having been inserted in 1972) provides as follows:

 (a) Whenever the Attorney General receives a complaint in writing—

 (1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, or

 (2) signed by an individual, or his parent, to the effect that he has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, sex or national origin,

 and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board or college authority and after certifying that he is satisfied that such board or authority has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate, and such court shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, provided that nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards. The Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief hereunder.

 . . . . .

 (b) The Attorney General may deem a person or persons unable to initiate and maintain appropriate legal proceedings within the meaning of subsection (a) of this section when such person or persons are unable, either directly or through other interested persons or organizations, to bear the expense of the litigation or to obtain effective legal representation; or whenever he is satisfied that the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property.

 . . . . .

 (c) The term "parent" as used in this section includes any person standing in loco parentis. A "complaint" as used in this section is a writing or document within the meaning of section 1001, Title 18.

the Academy, the Attorney General alleged in his complaint that the Academy's single-sex admissions policy was in violation of the fourteenth amendment. Injunctive relief was requested.

On May 5, 1976, the committee decided to recommend that admission be extended to women. It suggested, however, that they not "be actively recruited at this time." A few days later, the Academy moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and (6), claiming that the United States lacked authority to maintain the action on behalf of the complainant, that the fourteenth amendment was inapplicable because the Academy was a federal, rather than a state, instrumentality and that the controlling standards of the fifth amendment did not prohibit a single-sex admissions policy.

On June 10, 1976 the Board of Trustees voted to adopt the committee's recommendations and to admit the first class of women in September 1977. Mr. Lee, as Director of Admissions, was entrusted with the implementation of the new policy and with making the necessary adjustments. Ms. Kazukonis was invited to reapply for admission in the new class, but she declined to do so.

Thereafter, the Academy filed its answer to the complaint claiming that the action was mooted by the Board's June 10, 1976 decision. It insisted that "[a]ny discrimination in admissions policy prior to June 10, 1976 was required by or permitted under the aegis of federal statutes or regulations." The Academy's motion to dismiss was denied by the district court on September 1, 1976 after a hearing.

In the fall of 1976, the Massachusetts Commission Against Discrimination was allowed to intervene in the action, but the following year was stricken as an intervenor upon defendants' motion. *United States v. Massachusetts Maritime Academy*, 76 F.R.D. 595 (D.Mass.1977). Meanwhile, from 1977 to the present, women were being admitted to the Academy. In late 1979, while discovery was being conducted by the parties, the Academy filed a renewed consolidated motion to dismiss the complaint, claiming that the case had become moot because women were now admitted to the Academy on the same terms as men, and because Ms. Kazukonis, from whom the Attorney General had received the complaint, *see* footnote 2, *supra*, had not renewed her application for admission, although she was offered an opportunity to do so. This motion was also denied by the district court.

On October 24, 1980, the United States moved to amend its complaint so as to limit its original claim (based upon the males-only admissions policy) to the period before the Board's June 10, 1976 vote to accept women, and to add a new claim that, after that date the Academy had continued to discriminate intentionally on the basis of sex in its recruitment and admissions practices and procedures. The United States also sought to substitute the names of individual defendants to reflect changes in the membership of the Board. No new certification under 42 U.S.C. § 2000c–6 was filed by the Attorney General reflecting fresh complaints relative to the amended claims. Over defendants' opposition, the amendments were allowed by the district court on February 2, 1981.

On March 10, 1981, the United States moved to make supplementary amendments to the complaint, this time to reflect a reorganization of the public college system in Massachusetts. The newly created Board of Regents of Higher Education of the Commonwealth of Massachusetts ("Regents") and the Board of Trustees of the Academy ("Trustees") were substituted for the old Board of Trustees of the Massachusetts State Colleges. The complaint continued to name as defendants the President and the Director of Admissions of the Academy, but the name of the individual serving as the former was changed to reflect a new appointment. The motion was granted by the district court on December 23, 1981, again over defendants' opposition.

A bench trial was conducted before the district judge starting on January 19, 1982. The trial proceeded for 23 days during the

period from January to July 1982. After being recessed for nearly a year, the trial resumed in June of 1983, concluding within three more days. On March 21, 1984, the district court issued a memorandum of decision holding that the defendants had intentionally discriminated against women prior to June 1976 by maintaining a single-sex admissions policy, and thereafter, by their acts and omissions in the recruitment and admissions practices and procedures at the Academy. The court found that the effects of such discrimination still remained.

On May 22, 1984, the district court entered a judgment and order permanently enjoining defendants from discriminating on the basis of sex in the student recruitment and admissions processes at the Academy. Defendants were ordered to file a plan to eliminate the effects of their unlawful discrimination "in a swift and efficient manner." Defendants were also to submit a procedure for reviewing all rejected applications of women for the classes graduating from 1983 to 1987 in order to identify those rejected because of defendants' unlawful discriminatory practices. The above plans and procedures, embodied in a remedial order, together with the injunction and other components of the court's decision, were to constitute the final order in the case. The court indicated that it would retain jurisdiction for three years in order to enforce its order, during which period the Academy would have to file certain statistical data with the court regularly. The Academy has appealed from the injunction under 28 U.S.C. § 1292(a)(1).

The Academy challenges the district court's denial of its motions to dismiss, the court's allowance of the various amendments to the complaint submitted by the Attorney General, the court's finding of discriminatory intent, and certain evidentiary rulings. We discuss these matters below.

## II. THE DISTRICT COURT'S DENIAL OF THE ACADEMY'S MOTION TO DISMISS

### A. The Authority of the Attorney General to Maintain the Action

██ The Academy contends that the district court erroneously denied its motions to dismiss based on the Attorney General's alleged lack of authority to maintain this action. The Academy argues that Title IV of the Civil Rights Act of 1964, the statute relied on by the Attorney General for authority to sue, must be construed to contain the same exemption as appears in Title IX of the Education Amendments of 1972, as amended,[3] which excludes educational institutions "whose primary purpose is the training of individuals for the military services of the United States, or *the merchant marine*," 20 U.S.C. § 1681(a)(4) (1978) (emphasis added). Lacking authority to sue the Academy for sex discrimination under Title IV, defendants say the Attorney General is powerless to maintain this action since no other statute exists that would empower him to proceed.[4]

We disagree that the section 1681(a)(4) exemption in Title IX for merchant marine

---

**3.** 20 U.S.C. § 1681, *et seq.* The relevant provisions are as follows:

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

. . . .

(4) this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine.

20 U.S.C. § 1681(a)(4).

**4.** While we need not decide the issue, we shall assume for present purposes that defendants are right in their contention that, absent statutory authority, the Attorney General would lack the inherent authority to maintain an action to enforce the fourteenth amendment rights of third parties. *See United States v. City of Philadelphia,* 644 F.2d 187, 201 (3d Cir.1980); *United States v. Mattson,* 600 F.2d 1295, 1297 (9th Cir. 1979); *United States v. Solomon,* 563 F.2d 1121, 1127–28 (4th Cir.1977); *United States v. School District of Ferndale,* 400 F.Supp. 1122, 1130 (E.D.Mich.1975), *aff'd in pertinent part,* 577 F.2d 1339, 1345–1346 (6th Cir.1978).

academies prevents the Attorney General from suing here under the authority of Title IV. In seeking to read the Title IX exemption into Title IV, defendants rely on the fact that it was the same law, Pub.L. No. 92–318, 86 Stat. 373, 375 (1972), which both established Title IX and amended the existing Title IV to include "sex" among the categories of actionable discrimination. Defendants also claim support from *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), where the Court held that Title IX created an implied private cause of action in addition to the administrative remedy of termination of federal funding expressly provided in the statute. In *Cannon* the Court pointed out that Title IX was patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*,[5] which prohibits discrimination on the grounds of race, color or national origin in any program or activity receiving federal financial assistance, and that the congressional intention was that the same enforcement mechanisms available for the enforcement of Title VI be extended to Title IX. *Cannon*, 441 U.S. at 694–696, 99 S.Ct. at 1956–1957.

The Academy seizes on this observation to argue that Title IV was intended by Congress to form part of the enforcement mechanisms of Title VI, that it is limited to the enforcement of *statutory* rights created by Title VI and other civil rights legislation, such as Title IX, and that, therefore, its scope is subject to the limitations, including the merchant marine academy exemption, contained in these specific civil rights statutes sought to be enforced.

Defendants' argument might have force if Title IV empowered the Attorney General to enforce only statutory prohibitions against sex discrimination. In such case it might seem schizophrenic for Congress to exempt merchant marine academies from the sex discrimination prohibitions of one statute only to subject them to similar prohibitions in a companion statute. But when Title IV was amended in 1972 so as to include sex discrimination as one of the objects which the Attorney General was empowered to combat by bringing civil actions, it was already well accepted that Title IV authorized him to sue to enforce *constitutional* prohibitions against segregation in public schools on the basis of race or the other categories listed in Title IV. *See, e.g., United States v. Scotland Neck Board of Education*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); *Georgia v. Mitchell*, 450 F.2d 1317 (D.C.Cir.1971); *United States v. Board of Education, Independent School District No. 1*, 429 F.2d 1253 (10th Cir.1970), *vacated on other grounds*, 413 U.S. 916, 93 S.Ct. 3048, 37 L.Ed.2d 1038 (1973); *United States v. School District 151 of Cook County*, 404 F.2d 1125 (7th Cir.1968), *cert. denied*, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971). There is no reason to suppose that Congress, when it later inserted sex discrimination in Title IV, meant to narrow the Attorney General's powers in respect to this one type of discrimination.[6] Nor is there reason to suppose that Congress meant to prevent the Attorney General, under Title IV, from bringing to the attention of courts unconstitutional practices, wherever existent, that fell within the ambit of Title IV. The present suit was brought, and was considered by the district court, solely on the basis of whether or not the Academy was in compliance with the Constitution. We think the Attorney General was clearly empowered by Title IV to bring such a case without regard to Title IX exemptions.

That Congress intended in Title IV "to authorize the Attorney General to institute

---

5. 42 U.S.C. § 2000d provides,

> No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

6. If this was Congress's intention, one might ask why it was not so expressed in the amended text of Title IV. The section 1681(a)(4) exception in favor of service and merchant marine academies applies, by its terms, only to "this section." *See* note 3, *supra*.

suits to protect constitutional rights in education," not just statutory rights,[7] is clear from the legislative history prior to 1972. *See* H.R.Rep. No. 914, 88th Cong.2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad. News 2391. *See also id.* at 2399; 110 Cong.Rec. 6539 (1964) (statement of Sen. Humphrey); *id.* at 6560 (statement of Sen. Kuchel); *id.* at 6783 (statement of Sen. Javits); *id.* at 6815 (statement of Sen. Douglas); *id.* at 12,616–17 (statement of Sen. Muskie); *id.* at 12,689 (statement of Sen. Saltonstall). *Compare Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("The language and history of Title IV show that it was enacted not to limit but to define the role of the Federal Government in the implementation of the *Brown* [*v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] decision."); *United States v. School District of Ferndale,* 400 F.Supp. 1122, 1130 (E.D.Mich.1975), *aff'd in pertinent part,* 577 F.2d 1339, 1345–46 (6th Cir.1978) (Title IV proper vehicle for fourteenth amendment claims by Attorney General).

Significantly, 42 U.S.C. § 2000c–6 of Title IV is not limited, as is Title IX, just to institutions receiving federal funds, but extends to all "school board[s]"[8] and "public college[s]." Subsection (a)(1) expressly refers to the deprivation of "equal protection of the laws," while the rest of that subsection alludes to the goals of the "achievement of desegregation in public education," and "insur[ing] compliance with constitutional standards." This language is not consistent with the Academy's interpretation of Title IV as a mere enforcement mechanism for the statutory rights created by Title VI and Title IX.

Not only do the legislative history and language of Title IV indicate that it was meant to encompass actions brought by the Attorney General to enforce constitutional claims, the history of the 1972 amendment to Title IV adding sex discrimination does not reveal any intention to restrict the Attorney General's powers in this area. According to Senator Bayh of Indiana, sponsor of Title IX and the other amendments,[9] whose views the Supreme Court has treated as authoritative on the congressional intent behind the legislation, *North Haven Board of Education v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1920–21, 72 L.Ed.2d 299 (1982), the purpose of amending Title IV and other provisions to include sex discrimination was to close several loopholes of the Civil Rights Act by giving the Attorney General the *same* power with respect to sex that he already had with respect to discrimination on the basis of race, color, religion or national origin. *See* 118 Cong. Rec. 5808 (1972). *Compare* 117 Cong.Rec. 30,408 (1971) (statement of Sen. Bayh) ("We are only adding the 3-letter word 'sex' to existing law"). Since constitutional rights were embraced in the other categories, there is no basis to infer that only statutory rights were to be enforced with respect to sex discrimination.

There is, moreover, nothing illogical or inconsistent in not extending the merchant marine academy exemption in 20 U.S.C. § 1681(a)(4) to Title IV. Unlike Title IV, which applies to public schools and colleges, Title IX applies to federally funded programs in private as well as public institutions. *See Grove City College v. Bell,* 465 U.S. 555, ——–——, 104 S.Ct. 1211, 1219–21, 79 L.Ed.2d 516 (1984); *North Haven Board of Education v. Bell,* 456 U.S. at 538, 102 S.Ct. at 1926. A primary means for enforcing Title IX's bar against sex discrimination is to cut off the funding. 20 U.S.C. § 1682. Congress may have wished

---

**7.** *Compare* with the provisions of Title II, 42 U.S.C. § 2000a–5, and of Title III, 42 U.S.C. § 2000b.

**8.** "School board" is defined by 42 U.S.C. § 2000c(d) as "any agency or agencies which administer a system of one or more public schools and any other agency which is responsible for the assignment of students to or within such system."

**9.** Besides the provisions of Title IV already alluded to, the following provisions of the Civil Rights Act were also amended: 42 U.S.C. §§ 2000e(b)(1), 2000e–1, 2000c(b), 2000c–9, 2000h–2 and 1975c(a).

to shield service and merchant marine academies from funding cutoffs in order to avoid jeopardizing national defense interests. The same object would not necessarily compel them to forbid the bringing of lawsuits against those institutions under Title IV. The Attorney General and the courts might be expected to tailor relief so as to minimize harm to students and defense interests.[10] Some legislators, moreover, could have been unsure, in 1972, whether Congress should itself bar sex discrimination in service and merchant marine academies. They may have been undecided whether sex remained a legitimate job-related criterion in those specialized institutions. Such doubts, however, would not necessarily require them to withhold from the Attorney General the right to bring *constitutionally based* lawsuits against such institutions, since the Constitution is the supreme law of the land and job relatedness would, in any event, be a factor the courts would weigh in deciding whether or not a constitutional violation existed.[11] Thus we reject defendants' argument that

it is inconsistent or illogical not to read the Title IX exemption as applying here.

Finally, the Supreme Court's decision in *Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), strongly indicates that the Title IX exemptions are limited to that statute only. *Hogan* involved another of the exemptions in Title IX, 20 U.S.C. § 1681(a)(5), which provides that the prohibition of that title "shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex." Plaintiff was a man, who had been rejected by defendant Mississippi University for Women's ("MUW") school of nursing, which like the Academy, had a single-sex admissions policy. He brought an action under 42 U.S.C. § 1983 claiming that the single-sex policy violated his constitutional rights under the fourteenth amendment. Dismissing defend-

**10.** Senator Ribicoff distinguished between a funding cutoff and a judicial remedy when speaking of the funding cutoff provided by Title VI:

> In most cases alternative remedies, principally lawsuits to end discrimination, would be the preferable and more effective remedy. If a negro child were kept out of a school receiving Federal funds, I think it would be better to get the negro child into school than to cut off funds and impair the education of the white children.

110 Cong.Rec. 7067 (1964). It is perfectly possible that Congress intended to exempt state maritime academies from the hardships created by a cut-off of federal funds under Title IX while leaving open the "preferable" remedy of a Title IV action to correct sex discrimination.

**11.** Further indication that members of Congress did not necessarily expect the Title IX exemption to affect or diminish other obligations of exempt institutions *not* to discriminate on account of sex appears in the following remarks of Senator Bayh:

> For various reasons, the Senator from Indiana has exempted military schools from the provisions of this measure, but I hasten to point out that from the standpoint of the Senator from New York (Mr. Javits)—and I share his concern—this amendment in no way lessens or affects the authority that insti-

tutions run by the U.S. Government in the military area now have to provide educational opportunity for women students. This matter is being debated now; this amendment should not affect the debate.

> Frankly, as one Member of the Senate, I hope that women who want to follow a military career have the opportunity to get the best education available to permit them to reach the top of that profession. But this measure which is presently before us does not apply to military institutions in the various States. On my own behalf, and on behalf of the Senator from New York (Mr. Javits), I want to emphasize that this in no way lessens the responsibility of those who are presently charged with administering our Federal military academies to provide education for women applicants.

Later in the debate he added:

> Mr. President, as I said earlier, the military schools are excluded, not because of the feelings of the Senator from Indiana, but because I think this exception will greatly increase the chance of getting the measure passed. Frankly, I do not see a very great amount of discrimination going on in this area. It is isolated discrimination. I would rather have the program across the board than have an exception. However, there are a few isolated instances where a girl might want to get into a military school.

118 Cong.Rec. 5812–13 (1972).

ant's contention that the action was precluded by the cited exemption (defendant was an institution that had traditionally admitted only females), the Supreme Court held that the exemption could only serve, "at most, to exempt MUW from the requirements of Title IX." 458 U.S. at 732, 102 S.Ct. at 3340. *Compare Plaquemines Parish School Board v. United States,* 415 F.2d 817, 830 (5th Cir.1969) (Elementary and Secondary Education Act of 1965 forbidding federal interference in local schools with respect to management, curriculum dictation and other details of school administration did not affect the Attorney General's authority under Title IV absent the slightest indication that Congress meant to constrict the Executive Branch's enforcement of constitutionally based desegregation decisions and statutes).

We hold, therefore, that the exemption for merchant marine educational institutions contained in 20 U.S.C. § 1681(a)(4) does not affect the authority of the Attorney General to maintain an action under 42 U.S.C. § 2000c–6.

### B. Mootness

 Contending that Ms. Kazukonis's complaint to the Attorney General was mooted by her refusal to reapply after the Academy had invited her to do so, the Academy argues that the district court erred in not dismissing this action. It points out that by virtue of the June 10, 1976 vote of the Trustees, the single-sex admissions policy, which led to Ms. Kazukonis's rejection and her complaint to the Attorney General, was abandoned by the

Academy. Women were thereafter accepted and Ms. Kazukonis was invited to reapply, but she did not do so. Furthermore, Ms. Kazukonis is alleged to have been unqualified because she was deficient in math. Arguing that there remained no controversy between Ms. Kazukonis and the Academy and that the Attorney General could only sue on her behalf, the Academy insists that "the United States had no greater right to continue the suit after Ms. Kazukonis' individual claim had become moot than she would have had." [12]

We disagree that the Attorney General's authority to sue under 42 U.S.C. § 2000c–6 depends on the continuance, throughout the litigation, of a dispute between the individual complainant and the defendant college or school board. Both the legislative debate and the terms of Article IV, *see* 42 U.S.C. § 2000c–6(a), indicate that an action is to be maintained "for or in the name of the United States," and not simply on behalf of an individual complainant. *See* 110 Cong.Rec. 6539 (1964) (statement of Sen. Humphrey); *id.* at 6560 (statement of Sen. Kuchel); *id.* at 6783 (statement of Sen. Javits); *id.* at 6815 (statement of Sen. Douglas). A required purpose in all such cases is to "materially further the orderly achievement of desegregation in public education," with the Attorney General empowered to seek "such relief as may be appropriate." 42 U.S.C. § 2000c–6(a). Thus the dominant statutory purpose is to address and cure the discriminatory practices uncovered as a result of the individual

12. The Academy would also have us find mootness from the fact that the basis of the original complaint—the Academy's flat refusal to accept any women at all—was removed in 1977. However, the Attorney General's original complaint was amended in 1980 to allege that even after the Trustees' June 10, 1976 vote the Academy had continued to intentionally discriminate in the administration of its recruitment and admissions practices and procedures. The district court did not abuse its discretion in allowing this amendment. *See Marcial Ucin, S.A. v. SS Galicia,* 723 F.2d 994, 1001 (1st Cir.1983); *Corey v. Look,* 641 F.2d 32, 38 (1st Cir.1981). *Cf. Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 896

(1st Cir.1979) (leave to amend within discretion of trial court). Discovery had not been concluded by the parties, and the district court could have found that a reasonable period was necessary for the Attorney General to ascertain the sincerity of the Academy's efforts.

As discussed above, the Attorney General could proceed even though Ms. Kazukonis's individual complaint was mooted and even though it had pertained to an earlier, more blatant discriminatory policy. Since the amended complaint reflected a continuing controversy between the Attorney General and the Academy over sex discrimination in recruitment and admissions, the case did not become moot.

complaint, not simply to provide private relief for a particular complainant.

That private complaints are subordinate to the desegregative purpose of a Title IV action is borne out by Congress's intention that the determinations on which the certification are based should not be judicially reviewable. *See* H.R.Rep. No. 914, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. & Ad.News at 2399. *See also* 110 Cong.Rec. 6543 (1964) (statement of Sen. Humphrey) ("These statements by the Attorney General will not be subject to challenge either by defendants or by the court."). Courts have held that neither the defendant school board nor the courts have a right to examine the information which triggered the Attorney General's certificate. *Plaquemines Parish School Board v. United States*, 415 F.2d at 823; *United States v. Greenwood Municipal Separate School District*, 406 F.2d 1086, 1090–91 (5th Cir.), *cert. denied*, 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969); *United States v. Board of Education*, 295 F.Supp. 1041, 1045 (S.D.Ga.1969); *United States v. Junction City School District No. 75*, 253 F.Supp. 766, 768 (W.D.Ark.1966).

In *Greenwood,* the Fifth Circuit explained,

> In order to assure the anonymity of the complaining Negro parents, Congress vested authority in the Attorney General to make a final determination as to whether the complaints he receives merit legal action, whether the complainants would be able to initiate a suit themselves, and whether a suit would advance the desegregation of schools. Having issued a certificate in conformity with the statute, he acquires standing to sue. If it develops that no children in the school district are being denied equal

protection of the laws, then no relief will granted.

406 F.2d at 1090. In the present case, the Attorney General made a certification which was sufficient when suit was brought. That was all the statute calls for. Ms. Kazukonis's subsequent abandonment of interest in entering the Academy, and questions about her qualifications, did not remove the Attorney General's right to proceed. This right continues until sex discrimination and the effects of past discrimination are erased. *Id.*

By the same token, the Academy's dropping of an outright ban on women in 1977 did not require the Attorney General to file a new certification before he could be allowed to amend his pleadings to charge continuing sex discrimination in recruitment and admissions. The amendment simply involved a change in the method the Academy was alleged to use in discriminating against women. Essentially the same cause continued, and the original certification sufficed.[13]

## C. Federal Instrumentality

■ The Academy contends that the suit was erroneously based on the fourteenth amendment because, since it is subject to pervasive federal regulation in many areas of its operation in furtherance of national defense policy goals, it is really a federal instrumentality and thus subject to what it alleges are the different standards of the fifth amendment. It relies on *Department of Employment v. United States,* 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966).

This argument lacks any merit. Although it is highly unlikely the Academy could be considered a federal instrumentality in any event, *see, e.g., Forsham v. Har-*

---

**13.** With respect to the appropriateness of the amendment substituting the Regents and the Trustees as defendants in the suit, we note simply that 42 U.S.C. § 2000c–6 provides "[t]he Attorney General may implead as defendants such additional parties as are or become necessary to the grant of effective relief ...," and that the Regents and Trustees are under an affirmative obligation to eliminate all vestiges of past unlawful discrimination at the Academy, regard-

less of whether or not they were responsible for it. *See Columbus Board of Education v. Penick,* 443 U.S. 449, 458–59, 99 S.Ct. 2941, 2946–47, 61 L.Ed.2d 666 (1979); *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *Brown v. Board of Education,* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). Thus, this amendment was also proper.

*ris,* 445 U.S. 169, 180, 100 S.Ct. 977, 984, 63 L.Ed.2d 293 (1980); *United States v. Orleans,* 425 U.S. 807, 815–16, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976); *Maryland v. United States,* 381 U.S. 41, 48, 85 S.Ct. 1293, 1298, 14 L.Ed.2d 205 (1965), the short answer is that the standards for determining an equal protection claim under the fifth and fourteenth amendments are the same. *See Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975). It is thus immaterial whether or not the Academy is a federal rather than a state entity.

### D. Government Interest

■ In support of its motion to dismiss, the Academy also argued that its single-sex admissions policy substantially furthered an important government interest and that, therefore, it was not unconstitutional under controlling Supreme Court precedents. *See Mississippi University for Women v. Hogan,* 458 U.S. at 724, 102 S.Ct. at 3336; *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979). According to the Academy, it has been a consistent policy of Congress that state maritime academies serve as an auxiliary to the United States Navy in time of war or national emergency and that women not be allowed to serve in combat duty. It adds that the federal government has endorsed a single-sex admissions policy, first through its prior adoption of regulations that expressly required this and later, through the Title IX exemption of state maritime academies.

This argument, too, is meritless. National defense lies within the federal not state sphere. *Rostker v. Goldberg,* 453 U.S. 57, 65–67, 101 S.Ct. 2646, 2651–2653, 69 L.Ed.2d 478 (1981); *Schlesinger v. Ballard,* 419 U.S. 498, 510, 95 S.Ct. 572, 578, 42 L.Ed.2d 610 (1975). Since the federal government has opened its service academies and merchant marine academy to women, it is difficult to see how defendants can claim to be championing an important

federal governmental interest. The Academy cannot successfully invoke national defense interests to justify a policy that has been repudiated by Congress and the executive branch alike. *See* 38 Fed.Reg. 10,087 (1973) (eliminating "improper restriction[ ] on ... sex" with respect to merchant marine academy admissions); 46 U.S.C. § 1295b(b)(1)(A) (Supp.1984) (admission open to any "citizen of the United States"); 46 C.F.R. §§ 310.6, 310.54 (1984) (same). *See also* the Act of October 7, 1975, Pub.L. No. 94–106, 89 Stat. 531, 537–38 (opening federal military academies to women). *Compare* the district court's finding that the United States Merchant Marine Academy began admitting women in 1974.

With respect to the exemption in 20 U.S.C. § 1681(a)(4) of Title IX, we have seen that this was not meant to alter any obligation to provide equal educational opportunity that the Constitution placed upon public institutions such as the Academy. *See Mississippi University for Women v. Hogan,* 458 U.S. at 732–33, 102 S.Ct. at 3340–41. *See also* the statement of Senator Bayh, note 11, *supra.*

### III. THE DISTRICT COURT'S FINDINGS OF DISCRIMINATORY INTENT

■ With respect to its claim that after June 10, 1976 the Academy discriminated against women in recruitment and admissions, the United States was required to prove both disparate impact and discriminatory purpose. *See Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). The district court found both that the admissions procedures adversely affected women and that the Academy had been moved by a discriminatory purpose. The Academy challenges the latter finding as unsupported. We review for clear error only.

*See Pullman-Standard v. Swint,* 456 U.S. 273, 289, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982).

■ In its memorandum of decision, the district court observed that unlike most state and federal maritime institutions, the Academy had responded to the 1973 change in regulations with "at best, deliberate speed and lack of enthusiasm." As an example, it pointed to the United States Merchant Marine Academy, which changed its own single-sex admissions policy in February 1974, less than one year after the change in regulations, and which started admitting women within six months thereafter. By contrast, the Academy did not change its policy until 1976 and did not admit any women until 1977.

The court noted Admissions Director Lee's strong opposition to the admission of women to the Academy, finding that his views did not substantially change after formal abandonment of the single-sex admissions policy, that "he religiously followed the recommendation of the Ad Hoc Committee not to recruit women actively," and that, supported by the Academy's then president, he moved exceedingly slowly to implement the new policy.

The court also found that in spite of some changes in the recruitment literature after adoption of the new policy, the recruiting materials continued to represent the Academy as an all-male institution. "[N]either the catalog nor the recruiting brochure included pictures of women or textual references to them until 1979." The catalogs stated that the applicant had to be a "male U.S. citizen," and contained other references to male (only) applicants; application forms were geared to eliciting information as to traditional male activities such as football, without reference to traditional women's activities. When a poster announcing the change was produced, this was designed more in the spirit of an advertisement for "Club Med" than a maritime academy. The poster emphasized that the school would accept applications from "qualified females," whereas there was no literature addressed solely to "qualified

males." According to the government's expert, the Academy's steps to attract women were not only inadequate but these materials would have had a discouraging effect on prospective women candidates.

The court went on to find that the Academy's recruiting effort, apart from its literature, was ineffective to carry out its stated policy. Until 1981, there were no women on the admissions staff, and for five to six years after the policy change, the staff visited the same schools it had always visited, including some all-boys schools but no all-girls schools. Women were not mentioned on the poster announcing an open house for high school students until a November 1980 event. The court found that the inadequacy of the Academy's recruiting efforts was reflected in the small percentage of women applicants as compared with men. It noted that in 1977, 1,068 men and 30 women applied. By 1981, the figures were 1,063 men and 96 women.

The court found that women applicants were treated differently from men applicants in the scheduling of the physical examinations they were required to take. Men's examinations were scheduled for weekends and holidays whereas women's were scheduled for weekdays. Men applicants were given three opportunities to take the examination if they missed an appointment. Some women did not have this option.

The court found that women applicants were treated differently from men applicants with regard to interviews. It pointed out that whereas in the years from 1979 to 1981 about two thirds of the files of male applicants showed that they had been interviewed, few women applicants had been offered interviews during the same period.

The court also pointed out that the admissions formula devised by Mr. Lee left him a great deal of discretion in the decision to admit particular candidates and that "in the final analysis, his decisions were independent of the results of the formula and depended on his personal assessment of a candidate." It added,

That the Academy intentionally discriminated against women applicants is shown most graphically by a comparison of the qualifications of the successful and unsuccessful men and women. Women who did not meet the science and mathematics requirement were almost invariably rejected; a number of men lacking those courses were offered admission. Women with borderline eyesight or those whose physical qualifications were unclear failed to gain admission, while men similarly situated were accepted. The Academy even accepted some men who never submitted to the required medical examination. Until the class of 1985 no woman was placed on the waiting list from which lists a number of men ultimately did gain admission. The timing of admissions decisions varied for men and women to the detriment of women. Finally, and most cogent, the applicant files and statistics show a marked difference between the academic qualifications of men and women. The high school records and SAT scores of the successful man with the lowest composite grade was substantially below such grade for the lowest successful woman. A significant number of women were rejected who had better academic records than men who were accepted. I credit the testimony of plaintiff's expert ... that the Academy either did not use its articulated criteria making admission decisions or that it applied the criteria differently to men and women applicants.... [T]he grossly disparate treatment of men and women began to abate with the arrival of Captain Motte at the Academy and his active participation in the recruiting and the admissions process. Women had not, by the summer of 1982, achieved parity with men, however....

The court concluded from its findings that the Academy had engaged in intentional discrimination against women in recruiting and admissions throughout the period in issue, 1973 to 1982, and that the effects of such discrimination remain. It accordingly enjoined further such discrimination.

The Academy challenges a number of the district court's findings. First, it disputes the inference of discriminatory intent made by the district court on the basis of Admissions Director Lee's statements to the ad hoc committee expressing his opposition to the admission of women. It claims that these statements only show a justified concern with the implications of the proposed change in admissions policy and that no intent to discriminate after the change in policy could be inferred from them.

But we think the court could reasonably conclude that Mr. Lee's views concerning the unsuitability of women did not change after 1979. As memoranda and statements of his before the committee clearly show, he opposed the admission of women because of strongly held doubts that women as a class were qualified for admission or could function effectively at sea. Evidence was presented of derisive remarks made by him to a prospective woman applicant. It was up to the district court, which heard Mr. Lee's testimony and was exposed to much other evidence concerning inadequacies in the recruitment of women during his tenure, to draw inferences as to his intentions and policies. It was well within the court's discretion on this record to conclude that, being entrusted with implementing an admissions policy so contrary to his own judgment, Mr. Lee did not alter his views disfavoring women.

The Academy also challenges the district court's finding that the Academy moved exceedingly slowly in implementing its new policy. It claims that what the district court faulted as its lack of progress was due to budgetary limitations and to administrative difficulties. This was a matter primarily for the trial court, not ourselves, to weigh and sort out; we must sustain the court's finding unless clearly erroneous. This it plainly was not. To cite only some of the evidence suggesting a discriminatory purpose, the ad hoc committee stated that "little or no expense will be required to accommodate female cadets at the Academy" and that "[w]hile existing facilities are not ideal they are adequate." This, coupled with the male orientation of recruiting

and admissions materials and other differences in treatment between men and women in the admissions procedure, strongly supports the court's conclusion that the Academy was dragging its feet.

The Academy argues that the district court's finding that the Academy's efforts to recruit women lacked success is unsupported by the evidence. It contends that by 1982 it had achieved a level of female enrollment comparable to other maritime academies. It relies also on some expert evidence it introduced about the initial recruitment difficulties faced by single-sex institutions that have begun to admit members of the opposite sex.

However, figures presented by the United States established that at least until 1980 the Academy lagged considerably behind other maritime academies in the enrollment of women. With respect to the recruiting difficulties faced by the Academy, the district court could supportably find that, whatever these were, they were made worse by the Academy's half-hearted efforts which had a discouraging effect on prospective women applicants.

The Academy does not deny that women were treated differently with respect to physical examination scheduling and interviews. It claims, however, that women's examinations were scheduled for weekdays because women were invited to bring their families and were given a tour of the Academy, a privilege which was not afforded to men. It adds that female attendance did not show any significant improvement after their examinations were changed to weekends, the same as for men. With respect to the interviews it claims that "no woman ever complained about or was rejected for the lack of an interview." But whatever their actual impact, we think the court could infer from these practices that the Academy's attitude towards female recruitment was negative. It did not have to accept the Academy's somewhat implausible justification for weekday scheduling of

women's physicals, and it seems evident that denying women candidates the opportunity for an interview reflects a lack of interest in their recruitment, even if no woman candidate was ever rejected solely for this reason.

Finally, the Academy contends that the district court's finding that women were rejected where men of lesser qualifications were accepted was misleading, for some men were rejected who had better qualifications than some of the women admitted. This argument is offset, however, by the court's finding that the academic qualifications of the successful man with the lowest composite grade was substantially below the same grade for the lowest successful woman. Considering that the Academy was supposedly seeking out women aggressively, and in light of all the other evidence, the district court did not commit clear error by interpreting the data as it did.

In conclusion, we are unable to say that the district court committed clear error in its finding that the Academy acted with discriminatory intent.

## IV. THE DISTRICT COURT'S TRIAL RULINGS

■ During the trial, the district court prevented the Academy's counsel from cross-examining an official of the United States Merchant Marine Academy about the combat service of merchant marines. The Academy claims this ruling was erroneous because this testimony was pertinent to demonstrate the "exceedingly persuasive justification" which alone could entitle it to have maintained a single-sex requirement. *See Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981). We agree with the United States that the court did not abuse its discretion in excluding the evidence.[14] The pleadings filed by the Academy in this case show that it had sought to justify its single-sex policy on the ground that it "was required by or permitted under the aegis of

---

14. Noting that "this relatively simple case" had taken 26 trial days, the court complained in its decision of the length and laboriousness of the examination and cross-examination of witnesses.

federal statutes or regulations." Evidence as to the actual role of merchant marines in national emergencies was immaterial for this purpose, since all that needed to be done was to attend to federal policy as reflected in the pertinent statutes and regulations. *See* Part II(D), *supra.*

■ The Academy also challenges the district court's admission of several exhibits introduced by the United States, summarizing the Academy's applicant files for women and men. The Academy claims that the foundation for these exhibits was not properly laid. However, the government presented two witnesses who testified as to the method followed in preparing the summaries. The Academy had the opportunity to challenge the accuracy of the exhibits but declined to do so or to introduce copies of the originals which remained in its hands. The evidence was admissible under Fed.R.Evid. 1006, and the district court did not abuse its discretion in so ruling. *See* 5 J. Weinstein & M. Berger, *Weinstein's Evidence* § 1006[3] (1983).

■ Nor was it an abuse of discretion for the district court to admit the testimony of Ms. Kazukonis as to certain derogatory remarks made to her by Mr. Lee. *See* note 1, *supra.* The Academy claims that this evidence should have been excluded because Ms. Kazukonis conceded that she lacked present recollection of the statement, her testimony depending exclusively on her having been given to read before trial an affidavit she had submitted years earlier to the Attorney General. Fed.R. Evid. 612(2), however, permits a witness's memory to be refreshed in this way, the opposite party having a right to inspect the writing used before the trial to refresh the witness's memory only if the court determines it is "necessary in the interests of justice." *See generally* 10 J. Moore & H. Bendix, *Moore's Federal Practice* § 612.02 (1983); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 612[01] (1984). We find no error for the district court to have admitted this evidence.

■ Finally, the Academy attacks the court's refusal to admit evidence as to the progress achieved in the enrollment of women after July 1982 when the trial was recessed for almost a year until June 1983. When the July 1982 recess occurred, the United States had already rested its case, and when upon resumption the Academy attempted to introduce evidence about the progress achieved by the Academy in the intervening period, the court excluded it. It did, however, accept an offer of proof containing the salient information sought to be introduced. The court thought it unfair to allow the Academy to introduce facts for a period of time that the government had not been able to address. The Academy contends that, since the government's entitlement to relief depended on the continuing effects of the Academy's past discrimination, the evidence should have been admitted to show that relief was no longer necessary.

In its memorandum of decision, the district court recognized that the disparate treatment of women had begun to abate when Captain Geoffrey A. Motte took over the supervision of the admissions and recruitment process at the Academy in the early 1980's. The court concluded, however, that women had still not achieved parity with men by the summer of 1982, and that the effects of the Academy's past discrimination remained. The Academy contends that the excluded evidence would have shown that, by 1982, the Academy had not only caught up with the other state maritime academies, but that it had achieved a percentage enrollment of women that was higher than any of them, except Texas (a point now disputed by the United States).

The court, however, was not required to try the case indefinitely. Most of the trial had concluded by July of 1982, and to accept the new evidence would have required allowing the government to reopen its case. Given the evidence of persistent past discrimination, the district court was entitled to enter an injunction permanently enjoining any repeat discriminatory conduct even if the illegal conduct had by then ceased.

**158**

*See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See also City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). There was ample basis in the past conduct from which the court could reasonably fear reversion to earlier discriminatory practices.

The excluded evidence, moreover, pertained more to the appropriate specific relief to be granted than to the injunction which is the subject of this appeal. The court may and doubtless will take this information into account in determining what additional remedies are needed.

*The injunction is affirmed.*